In the Interest of D.M., B.W., and J.C.W.

No. 2–00–176–CV.

Court of Appeals of Texas, Fort Worth.

Oct. 4, 2001.

Nancy Ellen Tyler, Fort Worth, for appellant.

Tim Curry, Criminal District Attorney, and Charles M. Mallin, David M. Curl, and Cindy Williams, Assistant District Attorneys, Fort Worth, for State.

Panel F: LIVINGSTON, DAUPHINOT, and GARDNER, JJ.

## OPINION

GARDNER, Justice.

Appellant W.M. appeals the trial court's judgment terminating her parental rights to her children, D.M., B.W., and J.C.W. In three issues, she contends there is legally and factually insufficient evidence to support the judgment of termination. We conclude the evidence is both legally and factually sufficient to support the judgment rendered and affirm the trial court's judgment.

## BACKGROUND FACTS

Appellant is the mother of three children: D.M., who was born in 1988; B.W., who was born in 1994; and J.C.W., who was born in 1996. The Texas Department of Protective and Regulatory Services (TDPRS) first took possession of all three children in September 1997, when Appellant was arrested for hot checks and traffic tickets. The children were eventually returned to her in the summer and fall of 1998, with the TDPRS maintaining managing conservatorship of the children. On January 28, 1999, the TDPRS gave back managing conservatorship of the children to Appellant.

A few days later, Appellant was again arrested. Although the record is unclear, it appears Appellant was arrested for either having a fake ID or outstanding traffic tickets. The children were again removed by the TDPRS and placed in foster care. On February 3, 1999, the TDPRS filed its original petition seeking termination of Appellant's parental rights and was appointed as the children's temporary managing conservator.

After Appellant was released from jail, she contacted the TDPRS, and a service plan was implemented. The TDPRS began to seek a concurrent plan of family reunification and termination.

However, Appellant was again incarcerated in December 1999, and yet again in January 2000, for prostitution. The TDPRS decided to proceed with terminating Appellant's parental rights.

Termination proceedings began on March 1, 2000,[1] with the jury deciding that Appellant's parental rights to all three children should be terminated. The trial court adopted the jury's findings and entered a judgment terminating Appellant's parental rights.[2]

## TERMINATION OF PARENTAL RIGHTS

██ Parents' rights to "the companionship, care, custody and management" of their children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982). In a termination case, the State seeks not merely to limit those rights but to end them finally and irrevocably—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. *See* TEX. FAM. CODE ANN. § 161.206(b) (Vernon 1996); *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985).

██ Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by "clear and convincing evidence." TEX. FAM. CODE ANN. § 161.206(a). This burden is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 31 (Tex.1994). This is an intermediate standard that falls between the preponderance burden of ordinary civil proceedings and the reasonable doubt burden of criminal proceedings. *State v. Addington,* 588 S.W.2d 569, 570 (Tex.1979).

---

1. Because the suit was set for dismissal on February 7, 2000, the trial court extended the final dismissal date to August 5, 2000.

2. D.M.'s biological father is deceased. B.W.'s and J.C.W.'s biological fathers had not established any right to or interest in the children and did not appear at the termination hearing. The trial court also terminated their parental rights to B.W. and J.C.W.

The clear and convincing standard of proof creates a higher burden to fulfill because of the severity and permanency of the termination of the parent-child relationship. *In re J.N.R.*, 982 S.W.2d 137, 141 (Tex.App.—Houston [1st Dist.] 1998, no pet.). Termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re A.V.*, 849 S.W.2d 393, 400 (Tex.App.—Fort Worth 1993, no writ).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(1), (2) (Vernon Supp.2001); *Richardson v. Green*, 677 S.W.2d 497, 499 (Tex.1984). Proof of one does not relieve the petitioner from establishing the other. *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex.1976).

## JURY'S FINDINGS

In this case, the jury found: (1) Appellant knowingly placed or knowingly allowed D.M., B.W., and J.C.W. to remain in conditions or surroundings that endangered their emotional or physical well-being; (2) Appellant engaged in conduct or knowingly placed D.M., B.W., and J.C.W. with persons who engaged in conduct that endangered their emotional or physical well-being; and (3) termination of the parent-child relationship between Appellant and D.M., B.W., and J.C.W. would be in the children's best interests. Appellant contends the evidence is both legally and factually insufficient to support any of the statutory grounds for termination found by the jury.

## STANDARD OF REVIEW

When presented with legal and factual sufficiency challenges, the reviewing court first reviews the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981). In determining a "no-evidence" point, we consider all the evidence and inferences in the light most favorable to the party in whose favor the judgment has been rendered, and indulge every reasonable inference from the evidence in that party's favor. *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998) (op. on reh'g); *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997), *cert. denied*, 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). A no evidence point will only be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence, or (d) the evidence conclusively establishes the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex.1998), *cert. denied*, 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L.REV. 361, 362–63 (1960)). If there is more than a scintilla of evidence to support the judgment, the party's claim is sufficient as a matter of law. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996). There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of a vital fact. *Orozco v. Sander*, 824 S.W.2d 555, 556 (Tex.1992).

An assertion that the evidence is "factually insufficient" to support a finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). In determining a factual sufficiency point, we have previously concluded that the higher burden of proof in termination cases does not alter the appellate standard of review for factual sufficiency of the evidence. *See In re D.T.*, 34 S.W.3d 625, 630 (Tex.App.—Fort Worth 2000, pet. denied) (op. on reh'g); *Faram v. Gervitz–Faram*, 895 S.W.2d 839, 843 (Tex. App.—Fort Worth 1995, no writ) (both cases rejecting the "intermediate standard of appellate review" in cases involving the "clear and convincing" burden of proof). Rather, the higher burden of proof merely changes the weight of the evidence necessary to support a finding or verdict. *In re D.T.*, 34 S.W.3d at 632. When reviewing a finding made by clear and convincing evidence, we determine whether the evidence is sufficient to make the existence of the fact highly probable, not whether the evidence supporting the finding is sufficient to make the existence of the fact more probable than not, as in ordinary civil cases. That is, we must consider whether the evidence is sufficient to produce in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established. *Id.* We will sustain a factual insufficiency point only if the evidence is so weak or the evidence to the contrary is so overwhelming that the fact finder could not have reasonably concluded there was a high probability that the endangering conduct or conditions occurred or that termination was in the children's best interest. *Id.* We are required to consider all of the evidence in the case in making this determination. *Id.* at 630.

## THE EVIDENCE

Appellant admitted she had a drug problem and had been using cocaine on and off since before D.M.'s birth. She began using crack cocaine in 1986, and used it while she was pregnant with B.W., but quit using it when she found out she was pregnant with J.C.W. She admitted using crack cocaine as recently as February 1999, which is when she claimed she stopped using the drug. Appellant also had a history of arrests for prostitution, bad checks, failure to ID, and multiple traffic tickets.

From 1993 to approximately May 1997, Appellant lived with J.C. Williams, B.W.'s biological father. He was a drug dealer and drug user who supplied her with drugs and was often abusive towards her. Appellant left Williams and moved to a shelter, where she lived from approximately September 1997 to May 1998. Appellant also worked at the shelter, doing odd jobs.

The TDPRS first received a referral on Appellant in September 1997, when she was arrested at the shelter for hot checks and traffic tickets. Appellant gave the TDPRS the name of her sister and a friend who might be willing to look after the children while she was in jail. She also informed them that B.W. had been recently treated for asthma and had medication he needed to take. The children had no clothes or belongings with them, and she provided no medication for B.W. The children were hungry, dirty, and lice infested. When the sister and friend were unable to take the children, they were taken into custody and placed in foster care. However, at that time, the children were of average height and weight and were not malnourished or dehydrated. They did not have any developmental delays, were on track with their education, and D.M. was receiving As and Bs in school. The caseworker testified she

would not have taken the children into custody had Appellant not been arrested.

Appellant spent approximately one month in jail. Upon her release, she contacted the TDPRS. A service plan was developed, requiring Appellant to attend parenting classes, LAMs classes,[3] drug prevention classes, and submit to drug testing. Appellant showed interest in starting her classes and got a job. She attended LAMs classes and parenting classes that were provided to her at the shelter. The TDPRS explained that a counselor from one of the children's schools offered to provide Appellant with classes at the shelter because of Appellant's transportation problems. Appellant also attended some drug prevention classes and tested drug-free during this time. Additionally, she made most, if not all, of her weekly visits with the children. These visits went well. Appellant enjoyed the visits and brought the children toys and clothes. When she was informed D.M. had been acting out and having problems in her foster home, Appellant talked to D.M. and asked her to do better and stay out of trouble. As of March 1998, Appellant was making substantial progress on her service plan.

B.W. and J.C.W. were returned to Appellant in July 1998, but the TDPRS maintained managing conservatorship of the children. At that time, she was living in Azle with a friend, Michael Buttrill. It was known that Buttrill had a criminal history, several DWIs, and raised fighting chickens. After the children were returned, the TDPRS received two additional referrals. Upon investigation, they found no bruises on the children, no signs of physical abuse, and no evidence of neglectful supervision. In fact, the children appeared to be adjusting and doing well. However, there was evidence of constant drinking and fighting, with the police being called on one occasion. The TDPRS informed Appellant she needed to get the children out of that environment.

In September 1998, with the TDPRS' assistance, Appellant obtained an apartment through HUD. D.M. was returned to Appellant in October 1998, with the TDPRS still maintaining managing conservatorship of the children. The TDPRS continued to monitor Appellant and the children because referrals were constantly coming in. They learned Appellant was leaving the children on weekends with a friend named Dawn Bolin and people from the shelter while Appellant went to Azle to visit with friends. The TDPRS explained to Appellant this was not what the department wanted for the children, or what she should want for her children. Appellant signed a child safety evaluation and plan in which she agreed she would no longer leave the children in Bolin's care.[4]

On January 28, 1999, the TDPRS agreed to give Appellant managing conservatorship of her children again. Approximately two days later, Appellant was again arrested for either possessing a fake ID or for outstanding traffic tickets. The TDPRS was informed Appellant was in jail and the children were either unattended or were being cared for by people the children were not supposed to be with. The caseworker went to Appellant's apartment and found the children in Bolin's care. The apartment smelled of "urine and feces and dirt, sweat," was cluttered, the carpet was filthy, J.C.W.'s diaper looked as though it

---

3. The TDPRS described a LAMs class as one where parents meet to learn to maintain their families and receive instruction indirectly related to parenting.

4. Bolin apparently suffered from major mental health problems, and her own children were in TDPRS custody.

hadn't been changed in quite a while and he had a rash on both sides of his leg. The children were immediately removed and placed back in foster care. The TDPRS then filed its petition to terminate Appellant's parental rights.

About this same time, the TDPRS also received a referral from D.M.'s school regarding concerns about D.M. not attending school, her exhaustion at school from going to chicken fights with her mother on the weekends, scratches on her body, and head lice. A caseworker discussed these concerns with Appellant.

When Appellant was released from jail in March 1999, she again contacted the TDPRS. Service plans were again implemented. These plans required Appellant to maintain housing and employment, attend parenting classes, submit to random drug urinalysis tests, and have a psychological evaluation.

Appellant maintained her HUD apartment and made most of her visits with her children. However, she lost the apartment in September 1999 because she did not have her children. The caseworker who had the case until March 1999 testified she made monthly visits to the apartment, had major concerns, and would instruct Appellant she had to clean it up. The caseworker who took over in April 1999 testified she visited the apartment on two occasions. On the first visit it was considered clean. The second visit occurred when the children were removed in February 1999 and revealed unsanitary conditions. After losing the apartment, Appellant again lived either with friends, Williams, or in shelters.

Appellant also obtained employment at two different jobs from April to May 1999 and from July to November 1999. Appel-

lant claimed she lost her job in November because of her counseling sessions and classes. Appellant also testified she worked at other temporary jobs.

Between April and November 1999, Appellant submitted to the psychological evaluation and one urinalysis, which was inconclusive. She agreed to take additional tests, but these tests were never requested or scheduled by the TDPRS. However, she later failed to successfully complete a court ordered urinalysis or to show up for a retest.

Appellant did not attend any of the parenting classes that were set up for her after her February 1999 release from jail. She claimed to have transportation problems and scheduling conflicts with her job during this time. She did attend the TDPRS' permanency planning team (PPT) meetings except the last one.[5]

It was in October 1999 that the TDPRS finally determined Appellant had a severe drug abuse problem. It amended her service plan to require Appellant to attend individual counseling and community addiction treatment service program classes ("CATS classes").

At the October PPT meeting, Appellant still expressed a desire and willingness to comply with the service plan and have her children returned to her. Appellant attended three out of approximately thirteen individual therapy sessions and three out of approximately thirty-two CATS classes. She reported she was having either transportation problems, scheduling conflicts with her job, or the sessions were scheduled too early in the morning. Appellant was also incarcerated during the time she was to be attending some of these sessions and classes, having been arrested for prostitution in December 1999 and again in

5. It also appears Appellant attended all but one court proceeding, although it is not clear whether this information was presented to the jury.

January 2000. The record does not disclose how long Appellant stayed in jail for the December offense. However, she spent thirty days in jail for the January offense and was released on February 28, 2000.

The TDPRS decided to terminate Appellant's parental rights at the January or February 2000 PPT meeting based upon her failure to comply with her service plans and the children's need for permanency. A TDPRS caseworker testified that, between October 1999 and the last PPT, Appellant's involvement had "waned." "She was unable to come to visits as much. She did not participate in services and was not doing the types of things that we had hoped that she would do. And that is why at that—at the last PPT we decided to go this route and made this recommendation."

At trial, the counselor who had worked with Appellant in the therapy sessions testified about a residential treatment program she thought would benefit Appellant and her drug abuse problem. This structured program places participants and their children in on-site apartment type settings. Participants have very limited freedom, attend parenting classes throughout the day, obtain vocational training, and eventually graduate into outside group classes. Day care is provided for the children. Upon completion, participants are assisted in getting housing and continue their involvement with the program. The entire program lasts approximately three years. The counselor stated Appellant was the exact type of client this program was geared towards and that the program might improve Appellant's ability to work in an outpatient setting.

Appellant testified that she felt she could benefit from such a program because of the stability it offered. The TDPRS supervising caseworker also testified that,

if Appellant were able to participate in a residential treatment program such as this, it was possible her children could be returned to her sometime in the future, and that their relationship could continue to be nurtured and helped along with the TDPRS' assistance.

## LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE

### Endangerment Through Course of Conduct

 We first address Appellant's complaints that the evidence is both legally and factually insufficient to support the jury's finding that she engaged in conduct or knowingly placed D.M., B.W., and J.C.W. with persons who engaged in conduct that endangered their physical or emotional well-being. See TEX. FAM.CODE ANN. § 161.001(1)(E).

 Subsection E requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. Id.; In re B.S.T., 977 S.W.2d 481, 484 (Tex.App.—Houston [14th Dist.] 1998, no pet.). The parent's endangering acts need not have been directed at the child, or have caused an actual injury or threat of injury to the child; instead, this element may be satisfied by showing the parent in question engaged in a course of conduct that endangered the child's physical or emotional well-being. In re R.D., 955 S.W.2d 364, 368 (Tex.App.—San Antonio 1997, pet. denied).

 "Endanger" under subsection E means to expose to loss or injury, to jeopardize. Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987). The term means more than a threat of "metaphysical injury," but it is not necessary that the conduct be directed at the child or that the child actually suffer injury. Id. Nevertheless, there must be evi-

dence of endangerment to the child's physical or emotional well-being as the direct result of the parent's conduct. *In re R.D.,* 955 S.W.2d at 368; *Dupree v. Tex. Dep't of Protective & Regulatory Servs.,* 907 S.W.2d 81, 83–84 (Tex.App.—Dallas 1995, no writ).

It is inconsequential that the parental conduct considered in a termination proceeding occurred before the child's birth. Rather, courts look to what the parent did both before and after the child's birth to determine whether termination is necessary. *Avery v. State,* 963 S.W.2d 550, 553 (Tex.App.—Houston [1st Dist.] 1997, no writ).

Additionally, termination under subsection E must be based on more than a single act or omission; a voluntary, deliberate, and conscious "course of conduct" by the parent is required. *In re D.T.,* 34 S.W.3d at 634; *In re K.M.M.,* 993 S.W.2d 225, 228 (Tex.App.—Eastland 1999, no pet.); *In re J.N.R.,* 982 S.W.3d at 142. Imprisonment, standing alone, does not constitute "engaging in conduct which endangers the emotional or physical well-being of the child." However, it is a fact properly considered on the issue of endangerment. *Boyd,* 727 S.W.2d at 533–34; *In re D.T.,* 34 S.W.3d at 635–36; *In re B.S.T.,* 977 S.W.2d at 485. The State need not show incarceration was a result of a course of conduct endangering the child; it need only show incarceration was part of a course of conduct endangering the child. Thus, if the evidence, including imprisonment, proves a course of conduct that has the effect of endangering the child, the requirement of subsection E is met. *Boyd,* 727 S.W.2d at 533–34.

The TDPRS points to Appellant's housing instability and frequent incarcerations as evidence of conduct that endangered the children's emotional or physical well-

being. The TDPRS also points to Appellant's leaving the children in Bolin's care, a person whom the TDPRS and Appellant had agreed was an unsafe and inappropriate person to watch over the children, as evidence of endangering conduct. While there was conflicting evidence as to whether Appellant knowingly left her children in Bolin's care, the jury could conclude from the evidence that Appellant's instability, including her arrests and incarcerations, affected her ability to ensure that her children were properly taken care of and remained out of Bolin's care, as required by her service plan.

The TDPRS further contends that Appellant's failure to comply with her service plans in several other respects constitutes evidence of conduct that endangered the children's emotional and physical well-being. The primary evidence it relies upon is the fact that Appellant's "participation waned" between the October 1999 service plan and the January or February 2000 decision to terminate. It is undisputed Appellant attended only a few of the required counseling sessions and CATS classes and that she did not attend any parenting classes. Following her third and last counseling session on November 30, the evidence shows Appellant was arrested for prostitution and incarcerated.

Prior to this time, the evidence shows Appellant promptly contacted the TDPRS after she was released from jail on both occasions, that she participated in her service plans, and that she made such progress in 1998 that her children were returned to her. The record also shows that despite Appellant's poverty, transportation problems, and drug problem, she did participate, to some degree, in her service plans between the time the children were removed in February 1999 and the time the TDPRS made its decision to terminate. She was employed during some of this

time; she maintained the apartment for a year, losing it only because she did not have her children; she made most of her weekly visits with the children; she submitted to one urinalysis and a psychological evaluation; and she began her counseling sessions and CATS classes. These are difficult milestones considering Appellant's situation.

However, by Appellant's own admission, she has a drug problem. She has used cocaine and crack cocaine on and off for many years, including during her pregnancies with B.W. and J.C.W., and she admitted to using crack cocaine as recently as February 1999. After February 1999, Appellant took one urinalysis, which was inconclusive. She agreed to take additional tests. However, none were requested or scheduled because the State was not providing funding and Appellant was having to pay for her own tests and did not have the money. In January 2000, Appellant submitted to a court-ordered urinalysis, but she failed to successfully complete the test, and she failed to show up for the retest. Although there is no direct evidence of Appellant's continued drug use between the time her children were removed in February 1999 and termination, Appellant's counselor testified Appellant's behavior of missing appointments and minimizing her drug use was indicative that Appellant was still using drugs. Additionally, Appellant's failure to complete the court-ordered urinalysis is some evidence from which the jury could reasonably infer she was avoiding testing because she was still using drugs.

There is also evidence from which the jury could reasonably infer that Appellant's addiction had an adverse effect on the lives of her and her children and endangered their emotional and physical well-being. While Appellant failed to pay her traffic fines, which resulted in her arrest and incarceration on at least two occasions, Appellant obviously found a means to obtain money to purchase drugs. She resorted to prostitution, which resulted in her arrest and incarceration on at least two other occasions. At the time of her arrests for prostitution, Appellant knew she was in jeopardy of losing her children. There is also evidence that these were not isolated incidents, but a continuation of past conduct occurring at a time when Appellant admitted she used drugs. And, as we have already noted, Appellant's frequent incarcerations affected her ability to properly care for her children and comply with her service plans.

We conclude that, viewing the evidence most favorably to the jury's verdict, there is legally sufficient evidence of a voluntary, deliberate, and conscious course of conduct by Appellant from which the jury could reasonably conclude there was a high probability that her conduct endangered the children's emotional or physical well-being. Viewing all the evidence in the record in a neutral light, both that favoring termination and that favoring maintaining Appellant's parental rights, we conclude there is also factually sufficient evidence that Appellant engaged in conduct that endangered the children's physical and emotional well-being. Accordingly, we overrule Appellant's second issue.

 Because we have concluded there is both legally and factually sufficient evidence to support the jury's findings under subsection E, we need not address Appellant's first issue regarding the sufficiency of the evidence under subsection D; only one finding alleged under section 161.001(1) is necessary to a judgment of termination. *In re S.F.*, 32 S.W.3d 318, 320 (Tex.App.—San Antonio 2000, no pet.); *see also* TEX.R.APP. P. 47.1. However, in order to uphold the judgment of termination, we must also examine the

sufficiency of the evidence to support the jury's finding that termination is in the children's best interest. *See In re J.O.C.*, 47 S.W.3d 108, 114 (Tex.App.—Waco 2001, no pet.).

### Best Interest Of The Children

 In order to uphold the jury's termination finding, there must also be evidence that termination is in the children's best interest. There is a strong presumption that the best interest of a child is served by keeping custody in the natural parent. *In re K.C.M.*, 4 S.W.3d 392, 393–95 (Tex.App.—Houston [1st Dist.] 1999, pet. denied); *Ziegler v. Tarrant County Child Welfare Unit*, 680 S.W.2d 674, 676 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.). The fact finder may consider a number of factors in determining the best interest of the child, including: the desires of the child, the present and future physical and emotional needs of the child, the present and future emotional and physical danger to the child, the parental abilities of the person seeking custody, programs available to assist those persons in promoting the best interest of the child, plans for the child by those individuals or by the agency seeking custody, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371–72.

 "Best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *Id.* Quite often, the best interest of the child is infused with the statutory offensive behavior. While there are instances where the offending behavior will demand termination of parental rights, there are also those cases where the best interest determination must have a firm basis in facts standing apart from the offending behavior. Although such behavior may reasonably suggest that a child would be better off with a new family, the best interest standard does not permit termination merely because a child might be better off living elsewhere. Termination should not be used to merely reallocate children to better and more prosperous parents. *See In re C.H.*, 25 S.W.3d 38, 52–53 (Tex.App.—El Paso 2000, pet. granted).

The TDPRS points primarily to Appellant's history of drug use and instability as evidence supporting the jury's best interest findings. While Appellant's history, admissions, and conduct relating to drug abuse, and her inability to maintain a lifestyle free from arrests and incarcerations support the jury's endangerment finding, this evidence is also relevant to a best interest determination. Additionally, we review the evidence under each of the *Holley* factors.

### Desires of the Children

At the time of trial in this case, D.M. was 12 years old, B.W. was 5, and J.C.W. was 3 years old. While the two younger children were not able to express their wishes, it is undisputed Appellant and D.M. had a strong bond and that D.M. wanted to be returned to her mother. The guardian ad litem testified that, regardless of whether Appellant's parental rights were terminated, she believed D.M. would "always have contact with [her mother]" and "have that relationship maintained", and that it was "idiotic for any of us to think that [D.M.'s] not going to have conversations with [her mom] or contact with [her]." She also believed D.M. would resist adoption because "she still thinks she deserves to be with her mom."

B.W. also had a close bond with his mother and asked to go home with her at the end of most visits. Additionally, B.W. had a strong bond with D.M. and wanted to be with her. After family visits, he

exhibited negative behaviors "exemplify[ing] his separation anxiety."

There was evidence that D.M. and B.W. were not close to J.C.W. The evidence also showed that B.W. and J.C.W. were becoming closer, with J.C.W. wanting to be with his older brother. During visits, the family appeared to interact well together. The evidence shows Appellant made most of her weekly visits with her children, that the visits went well, and that both the children and Appellant enjoyed their visits together.

### Parental Abilities

The children's guardian ad litem testified she believed Appellant did not really understand what a good parent needs to be in order to raise children that are going to be productive citizens one day. She believed it was in the children's best interest to have Appellant's parental rights terminated because they "deserve stability and stable parents."

Contrary evidence showed all children were developmentally on track; they did not have any special or extensive needs to address; Appellant provided them with food, clothing, and attended to their medical needs; D.M. was very bright and did very well in school; and, when D.M. acted out and was having problems in foster care, Appellant talked to her and asked her to do better and stay out of trouble. Appellant also testified she talked to D.M. about school and helped her with her homework, she played and watched television with B.W., and she read to J.C.W. before bedtime.

The guardian ad litem testified she visited D.M.'s school, had a good visit with the principal, and left her business cards at the school for each of D.M.'s teachers with instructions for them to call her regarding D.M. "being abnormal ... having any strange behaviors or outbursts in class, ... [or] something that was unusual for a student to show that she might be having trouble." The TDPRS did not present evidence of any responses to the ad litem's instructions.

Appellant's counselor, although expressing some concerns about Appellant's ability to parent, testified she did not have enough time with Appellant to determine her actual ability to parent her children.

### Current and Future Needs and Dangers to the Children

With regard to the children's present and future physical and emotional needs or endangerment, the TDPRS again points generally to the children's need for permanency and Appellant's inability to provide a stable and safe home and lifestyle for herself and the children. The TDPRS also argues that D.M. will need some counseling as a result of her being sexually molested while in foster care to support its conclusion that returning D.M. to Appellant would not be in D.M.'s best interest.

To Appellant's credit, it was she who first discovered information, during one of her weekly visits with the children, about D.M.'s encounter while in foster care, which led the TDPRS to discover that D.M. had been sexually molested by another foster child. There is no direct evidence Appellant would be unable to meet D.M.'s added emotional needs, although there is evidence showing Appellant did not always meet all of her children's needs. First, there is evidence Appellant did not have appropriate care for the children during her periods of incarceration. D.M. also testified the children did not get enough attention from their mother before they first went into foster care because of her mother's drug problem. However, D.M. further testified that Appellant did provide them with a place to live and food and made D.M. feel safe. Since they were returned to Appellant, however, D.M. stat-

ed drugs were not a problem, Appellant was always at home with them, and no "bad things" happened.

TDPRS caseworkers also testified that no special services were set up for any of the children. Under the TDPRS' "level-of-care system," which is based on a 1 to 6 scale with 6 being the most needy, the children were designated a level 1, meaning they had no extensive needs.

### Acts/Omissions Indicating Parent–Child Relationship is not Proper

As for acts indicating the parent-child relationship between Appellant and her children is not proper, there is evidence Appellant allowed D.M. to take on a parenting role. One caseworker testified she did not believe Appellant understood that this type of relationship was inappropriate. Another caseworker testified that she spoke to Appellant about her concerns that D.M. took on a supervisory role of her younger brothers. Sometimes she saw improvement and sometimes not.

### Plans for the Children

Regarding future plans for the children, the TDPRS stated its goal was adoption, focusing on the children's need for stability and permanency. The TDPRS generally believed the children were adoptable and could be adopted together. The TDPRS admitted that the children are not currently in adoptive placement, but are living apart in two different foster homes. There is no evidence of any adoption prospects for these three children, separately or together.

The evidence also showed the children are not of the same race, D.M. and B.W. being racially mixed, which the TDPRS admitted would impact their potential for placement to some degree. The TDPRS also admitted the age of a child impacts adoption; the older the child, the fewer opportunities for adoption. D.M. was 12 years old at the time of trial, B.W. was 5, and J.C.W. almost 3. There was also evidence D.M. was expelled from school on five occasions while in foster care, that she was not ready for adoption, that she would resist adoption, and that she would need some type of therapeutic intervention to better prepare her for adoption.

Appellant admitted she had no job and no place to live at the time of trial, and she was not ready for the children to be returned to her. She had applied for one or two jobs at the time of trial. She also knew the children were okay with their foster families. Appellant admitted stability was a problem and that she had difficulty managing because of her living and transportation problems. However, she loved her children and did not want her parental rights terminated.

### Available Programs

Appellant's counselor also did not recommend returning the children to Appellant, but would like to see Appellant do further work on a service plan and participate in some residential treatment, which might improve her ability to work in an outpatient setting. She had worked with TDPRS clients for approximately eight years, and testified that some clients were asked to participate in a residential treatment program with intensive outpatient followup. She testified about a specific residential drug treatment program that might benefit Appellant and through which she might be able to have her children returned to her, providing both stability and safety for the children. When asked about the residential treatment facility, Appellant testified she believed, from what she had heard, it would definitely provide her with more stability, which is something that had been difficult for her. Appellant's counselor also testified that Appellant willingly participated in the three counseling

sessions she attended, although she did not show up for the fourth appointment.

A TDPRS caseworker testified Appellant had been given several opportunities since 1997 to improve her lifestyle and, more often than not, would start engaging in the services provided and then stop, with the end result being Appellant never fulfilled any of the services she was asked to fulfill. Another caseworker testified that based on Appellant's previous experiences with the TDPRS, she would not expect Appellant to be successful even if given continued services.

We hold that the foregoing evidence, coupled with Appellant's history of drug abuse, her admissions and conduct relating to recent drug use, and her inability to maintain a lifestyle free from arrests and incarcerations, is some evidence that termination would be in the children's best interest. While this evidence overlaps the proof required to establish endangerment by her course of conduct, it also provides legally sufficient evidence to support the finding that termination is in the children's best interest.

In considering the factual sufficiency of the evidence to support the jury's findings, this court must set aside the findings and grant a new trial if an answer of the jury to a material issue is so contrary to the overwhelming weight of clear and convincing evidence as to be clearly wrong or manifestly unjust. However, we may not substitute our opinion for that of the jury merely because we might have reached a different fact conclusion. *See Thompson v. Wooten,* 650 S.W.2d 499, 501 (Tex.App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.). The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Eris v. Phares,* 39 S.W.3d 708, 713 (Tex.

App.—Houston [1st Dist.] 2001, pet. denied). While the evidence presents a close case, after reviewing all of the evidence presented and mindful of the fact that we may not reweigh that evidence or reassess the credibility of the witnesses, we cannot conclude that, under all of the evidence in the record in this case, the jury's finding that termination of Appellant's parental rights is in the children's best interest is not manifestly wrong and unjust. We hold that the totality of the evidence in light of the *Holley* factors and other relevant factors is factually sufficient to establish by clear and convincing evidence that termination is in the children's best interest. We overrule Appellant's third issue.

## Conclusion

Having determined the evidence is both legally and factually sufficient to support the jury's findings under sections 161.001(1)(E) and 161.001(2), we affirm the trial court's judgment.

DAUPHINOT, J. filed a concurring opinion.

DAUPHINOT, Justice, concurring.

Because the law requires that we affirm the jury's verdict if the evidence to support it is legally sufficient and sufficient to make the existence of the facts found by the jury highly probable,[1] I have no alternative but to concur in the majority's holding.

As the majority points out, a parent's right to the companionship of his or her children is far more precious than any property right. That companionship is as precious, in my opinion, as the right to liberty or to life itself. Equally important, I believe, is the right and the necessity of brothers and sisters to have each other's

---

1. *See In re D.T.,* 34 S.W.3d 625, 630–31 (Tex. App.—Fort Worth 2000, pet. denied).

companionship and support. Yet, unlike non-criminal deprivation of liberty provisions, such as involuntary mental illness commitment proceedings, there is no requirement that termination of the parent-child relationship be the least draconian alternative that adequately protects the child's welfare or that the bonds between siblings be preserved.[2]

The record before us reflects poor parenting and drug addiction. However, the record also reflects:

1. A close bond between Appellant and D.M., who is now nearly fourteen years old.

2. A close bond among the children, who were separated when TDPRS assumed custody.

3. No evidence of any adoption prospects for the children after termination, either separately or together.

4. Separation anxiety suffered by B.W., who is now almost eight years old, when he was not allowed to go home with his mother at the end of family visits.

5. D.M.'s sexual abuse, which occurred while she was in foster care.

6. A loving bond between Appellant and her children.

7. The availability of a three-year residential treatment program that preserves the family unit and promotes the development of parenting skills.

Additionally, the record reflects that D.M. will likely not be adopted and that B.W.'s racially mixed parentage will adversely impact his potential for placement. If not adopted, the children must remain in foster care. This is true although TDPRS's stated goal for the children fo-

cused on their need for stability and permanency.

This court is limited to determining whether the evidence supports the jury's findings under the law as it now stands. Only the legislature has the authority to enact laws that would require the petitioner to prove that termination is not only in the best interest of the children but also that termination is the least draconian alternative available under the specific circumstances presented.

Because the law permits me no alternative, I concur in the majority's opinion.

---

**2.** *See* Tex. Health & Safety Code Ann. § 574.036(d) (Vernon Supp.2001) (requiring that court-ordered mental health services be provided "in the least restrictive appropriate setting available"); Tex. Fam.Code Ann. § 161.001 (Vernon Supp.2001).