# NO. 12-14-00029-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE 3RD* |
| *S.M., M.M., AND J.M.,* | § | *JUDICIAL DISTRICT COURT* |
| *CHILDREN* | § | *HENDERSON COUNTY, TEXAS* |

## MEMORANDUM OPINION

K.M. appeals the termination of his parental rights. In four issues, he challenges the order of termination. We affirm.

## BACKGROUND

K.M. is the father of S.M., born April 11, 2009; M.M., born December 2, 2011; and J.M., born December 27, 2012. M.B. is the mother of the children and is not a party to this appeal. On December 28, 2012, the Department of Family and Protective Services (the Department) filed an original petition for protection of the children, for conservatorship, and for termination of K.M.'s and M.B.'s parental rights. The Department was appointed temporary managing conservator of the children, and K.M. and M.B. were appointed temporary possessory conservators with limited rights and duties.

At the conclusion of the trial on the merits, the trial court found, by clear and convincing evidence, that K.M. had engaged in one or more of the acts or omissions necessary to support termination of his parental rights under Texas Family Code Section 161.001, subsections 1(D) and 1(E). The trial court also found that termination of the parent-child relationship between K.M. and the children was in the children's best interest. Based on these findings, the trial court ordered that the parent-child relationship between K.M. and the children be terminated. This appeal followed.

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West 2014); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. TEX. FAM. CODE ANN. § 161.001(1) (West 2014); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(2) (West 2014); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014). The burden of proof is upon the party seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

**STANDARD OF REVIEW**

When confronted with both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm

belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id*.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).


### TERMINATION UNDER SECTION 161.001(1)(E)

In his third issue and a portion of his first issue, K.M. argues that the evidence is legally and factually insufficient to support a finding that he engaged in conduct, or knowingly placed the children with persons who engaged in conduct, that endangered the children's physical or emotional well being.

**Applicable Law**

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well being of the child. TEX. FAM. CODE ANN. § 161.001(1)(E) (West 2014). The specific danger to the child's well being need not be established as an independent proposition, but may instead be inferred from parental misconduct. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re J.J.*, 911 S.W.2d at 440. Scienter is not required for an appellant's own acts under Section 161.001(1)(E), although it is required when a parent places his child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Finally, the need for permanence is a paramount consideration for the child's

present and future physical and emotional needs. *In re N.K.*, 99 S.W.3d 295, 301 n.9 (Tex. App.—Texarkana 2003, no pet.); *In re M.D.S.*, 1 S.W.3d at 200.

"Endanger" means to expose to loss or injury or to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.). It is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Boyd*, 727 S.W.2d at 533; *In re J.J.*, 911 S.W.2d at 440. Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied); *In re D.M.*, 58 S.W.3d at 811. Termination under subsection (E) must be based on more than a single act or omission. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). A voluntary, deliberate, and conscious "course of conduct" by the parent that endangers the child's physical and emotional well being is required. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d at 634.

A parent's use of narcotics and its effect on his ability to parent may qualify as an endangering course of conduct. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *see also In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Further, a parent's illegal drug use can support termination for endangerment because it exposes the children to the possibility that the parent may be impaired or imprisoned. *Melton v. Tex. Dep't of Family & Protective Servs.*, No. 03-08-00168-CV, 2010 WL 668917, at *5 (Tex. App.—Austin Feb. 25, 2010, no pet.) (mem. op.).

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well being of a child. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); *In re R.W.*, 129 S.W.3d at 739. Evidence of criminal conduct, convictions, and imprisonment and its effect on a parent's life and ability to parent may establish an endangering course of conduct. *In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.). Imprisonment alone does not constitute an endangering course of conduct, but it is a fact properly considered on the endangerment issue. *Id.* (citing *Boyd*, 727 S.W.2d at 533-34). Conduct that routinely subjects children to the probability that they will be left alone because the parent is once again jailed, whether because of the continued violation of supervisory conditions or because of a new offense growing out of a continued use of illegal

drugs, endangers both the physical and emotional well being of the children. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

**The Evidence**

At trial, Christopher Barley, a caseworker with the Department, testified that he was assigned the case in March 2013. He stated that the Department removed the children shortly after J.M. was born because M.B. gave birth at home, K.M. delivered the baby and called an ambulance, and J.M. tested positive for methamphetamines. He said that M.B. tested positive for methamphetamines, cocaine, and cannabis. S.M. and M.M. also tested positive for methamphetamines. K.M. stated that he delivered J.M. at the house because the baby came "instantly." K.M. knew that M.B. was using methamphetamine, but did not know when she last used drugs. He also did not know she was high when she gave birth to J.M. K.M. did not appear at the hospital until M.B. was ready to be discharged because there was an outstanding warrant for his arrest. He then told the Department that he was J.M.'s father and was subsequently arrested.

K.M. testified that at the time of trial, he was in state jail. He was twenty-seven years old and had not "been arrested too many times." However, the record shows that he was arrested at least five times between July 2003 and December 2012 for approximately eleven different offenses. He was arrested in 2006 and 2007 for unlawful carrying of a weapon, burglary of a building, and unauthorized use of a motor vehicle. He was convicted for these offenses and was sentenced to time in jail, ranging from 75 days to 270 days. In 2009, K.M. was arrested, pleaded guilty, and convicted for the offense of theft of property, a state jail felony. He was sentenced to community supervision for three years. He was arrested in December 2012 for unauthorized use of a motor vehicle, and evading arrest or detention with a motor vehicle, which are state jail felonies. He pleaded guilty to both offenses, was convicted in February 2013, and was sentenced to confinement for fourteen months for each offense. K.M. said that he should be released from state jail on February 4, 2014.

K.M. testified that his drug of choice was methamphetamines and that he began using methamphetamines and marijuana when he and M.B. met approximately seven years ago. He denied using alcohol, heroin, or cocaine. He said he and M.B. had been "clean" off and on, and that he was sober for a couple years after S.M. was born. K.M. knew that M.B. used methamphetamines, but did not know that she used other controlled substances until the drug

tests in the hospital. However, he admitted that they lived together for seven years and that when he was not in jail, he had been with M.B. "constantly" since S.M. was born. He would not be surprised that J.M. tested positive for methamphetamines, but did not know that S.M. and M.M. also tested positive for methamphetamines. However, he said, it would not surprise him that they were exposed to drugs.

K.M. denied smoking methamphetamine in front of the children or that he was around them when he was high on drugs. He denied that he or M.B. used drugs in front of the children, but agreed that he smoked methamphetamine in the house. According to K.M., the children were with M.B. at the other end of the house when he used drugs. He stated that when he and M.B. used drugs together, they were with friends. Their children would be playing outside and were being looked after by friends who were drug addicts. K.M. also admitted that he cared for the children after he smoked methamphetamine. He did not believe that his drug use endangered the physical or emotional well being of his children, and said that he "never put [the children] in danger." However, he agreed that being on drugs or under the influence when he was around the children was, in fact, a danger to them.

K.M. stated that he voluntarily attended a drug rehabilitation program in jail, participated in an anger resolution seminar, and completed a Bible study. He stated that he learned to be a better person and parent through his drug rehabilitation program, but "nothing specific" in order to help him stay away from drugs. He stated that he had not used drugs "much," but could not describe what caused him to use drugs, such as his "triggers." According to K.M., his drug rehabilitation had "nothing to do with that." In his opinion, the trial court should not be concerned that he would use drugs again. He stated that he did not need anyone to make sure that he was staying clean because he was his own person.

Barley believed the children were placed in danger of physical abuse because they tested positive for methamphetamines. He believed that K.M. endangered his children and that he also endangered them by leaving them with M.B. Keith Loper, the CASA supervisor, believed that methamphetamine use in and around children was extremely endangering conduct. He believed it would be "pretty unsettling" for a parent who used methamphetamine to be the primary caregiver of a child because methamphetamine was known to cause massive mood swings, temper issues, unpredictability, and contact residue. It would be very dangerous even if the parent was using methamphetamine in one room of a house while the children were in another

6

room or if the children were outside with drug addicts. According to Loper, S.M. and M.M. tested positive for methamphetamines and were vulnerable. As a result, he believed that K.M. engaged in conduct that endangered the children.

## Conclusion

Viewing the evidence in the light most favorable to the finding, the trial court reasonably could have determined that K.M. used methamphetamines in the house while the children were in his care, used drugs with M.B. while the children were being looked after by drug addict friends, and cared for the children after he smoked methamphetamine. The trial court also reasonably could have determined that K.M.'s actions exposed the children to the possibility that he may be impaired or imprisoned. *See Melton*, 2010 WL 668917, at *5. The evidence further demonstrated that K.M. knew M.B. was using methamphetamines while she was pregnant with J.M. and that all three children tested positive for methamphetamines. K.M.'s repeated incarcerations and continued illegal drug use subjected the children to a life of uncertainty and instability that endangered their physical and emotional well being. *See In re M.R.J.M.*, 280 S.W.3d at 503; *In re R.W.*, 129 S.W.3d at 739.

K.M. attended a drug rehabilitation program while in jail and stated that he learned to be a better person and parent. He also believed that the trial court should not be concerned that he would use drugs again. Although this evidence may contradict the trial court's findings, it is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that K.M. engaged in conduct, or knowingly placed the children with persons who engaged in conduct, that endangered their physical or emotional well being. Therefore, we hold that the evidence is legally and factually sufficient to support termination of K.M.'s parental rights under Section 161.001(1)(E). Accordingly, we overrule K.M.'s third issue and that portion of his first issue regarding Section 161.001(1)(E).

## BEST INTEREST OF THE CHILDREN

In his fourth issue and a portion of his first issue, K.M. argues that the evidence is legally and factually insufficient to support a finding that termination of his parental rights was in the best interest of the child. In determining the best interest of the child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the

7

future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

This list is not exhaustive, but simply indicates considerations that have been or could be pertinent. *Id.* However, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. *In re D.M.*, 58 S.W.3d at 814. The *Holley* test focuses on the best interest of the child, not the parent's best interest. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). We apply the *Holley* factors below.

**The Evidence**

In addition to the testimony discussed above, the evidence included K.M.'s testimony that when he was released from prison, he planned to get a job and would be able to live with his parents until he could obtain a house. He stated that in the past, he built grain silos, worked at fast food restaurants, and had been a maintenance man. He believed he would be able to take care of the children at some point after his release from prison. K.M. stated that he had not been able to participate in services required by his family plan of service. However, he said, he voluntarily attended a drug rehabilitation program, participated in an anger resolution seminar, and completed a Bible study. He believed it was more M.B.'s fault that the children were in the care of the Department because she had a chance to get them back and did not. K.M. then stated that his "trigger" for using drugs was probably M.B. He admitted that his choices led to his being incarcerated.

K.M. said that he was the primary caregiver for the children. He said that he loved his children, that they "never did without," and that they had their own bedrooms and lots of toys. He stated that he and his children were bonded. He said that S.M. was a toddler and M.M. was just walking when they were removed. K.M. stated that he wrote letters to the children. He did not know if the children received them. He did not believe it was in the children's best interest for his parental rights to be terminated.

K.M. admitted that along with the children who are the subject of this suit, he has four other children. These children are living with their mothers, one of whom is living in another

8

state, or with other relatives. He said that he had contact with only two of his children. Further, K.M. testified that he pays child support for two of the children, was behind on support when he went to jail, and believed he would owe back child support when he was released.

Barley testified that he received two letters from K.M. regarding the children, and sent him approximately nine letters, including progress reports. He did not receive any telephone calls from K.M. regarding the children. The Department created a family plan of service for K.M., but Barley realized that K.M. could not complete his services while in jail. He was willing to accept the parenting classes and anger management seminar that K.M. completed. He stated that K.M. seemed to be serious about changing his life. Barley noted that in the affidavit of removal, K.M.'s mother was contacted and stated that she was "not going to do this again." He said that K.M. did not complete a child placement form or indicate that his family was willing to be a placement for the children. According to Barley, K.M.'s family never asked for visitation. He explained to K.M.'s mother that he believed their house did not have enough room because M.M. would need her own room. He was concerned that, until recently, none of K.M.'s family had stepped forward for the children.

Barley said that the children were together in a foster home and doing great. He stated that S.M. and J.M. have some minor medical issues that will be addressed surgically. S.M. has some behavioral issues at school, including acting out and anger. As a result, S.M. is in play therapy. Barley believed that the best option for the children was for K.M.'s parental rights to be terminated and for the children to be adopted. However, Barley stated that the children's current home was not an adoptive home, and he could not guarantee that they would be able to stay together. Loper also recommended that K.M.'s parental rights to the children be terminated.

K.M.'s mother stated that K.M. had a wonderful relationship with his children and that the children loved him very much. She knew that K.M. had some problems in the past with drugs, but did not realize that it was methamphetamines. K.M.'s stepfather never saw K.M. in a condition in which he believed K.M. was high on drugs. K.M.'s mother and stepfather said that they were willing to take the children, but the Department explained that they needed a separate bedroom for M.M. K.M.'s stepfather said they were in the process of building an addition to the house, including two more bedrooms. K.M.'s mother and stepfather did not believe it was in the children's best interest for K.M.'s parental rights to be terminated. K.M.'s grandfather testified

that K.M. loved his children, and K.M.'s fifteen year old brother testified that K.M. had a great relationship with S.M. and M.M.

**Conclusion**

Viewing the evidence relating to the ***Holley*** factors in the light most favorable to the finding, we hold that a reasonable fact finder could have formed a firm belief or conviction that termination of K.M.'s parental rights was in the best interest of the children. However, K.M. points out that the children and his family had a close and loving relationship, there is no evidence that the children suffered from malnourishment or abuse before they were removed, there is no evidence that the children suffered any long term effects from being around drugs, he took good care of his children, he participated in programs to help with drug addiction issues, and his family would help him. Although this evidence is contrary to the trial court's finding, it is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that terminating K.M.'s parental rights was in the best interest of the children. Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of K.M.'s parental rights is in the best interest of the children. Accordingly, we overrule K.M.'s fourth issue, and the portion of his first issue regarding the best interest of the children.

**DISPOSITION**

Having overruled K.M.'s third and fourth issues, and the portions of his first issue regarding Texas Family Code Section 161.001(1)(E) and the best interest of the children, we ***affirm*** the judgment of the trial court.[1]

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered June 25, 2014.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)

---

[1] Because we have concluded that the evidence is legally and factually sufficient to support termination of K.M.'s parental rights under subsection (1)(E), we need not address K.M.'s second issue, and that portion of his first issue regarding subsection (1)(D). *See* TEX. FAM. CODE ANN. § 161.001(1); TEX. R. APP. P. 47.1.



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JUNE 25, 2014**

**NO. 12-14-00029-CV**

**IN THE INTEREST OF S.M., M.M., AND J.M., CHILDREN**

Appeal from the 3rd District Court

of Henderson County, Texas (Tr.Ct.No. 2012C-1271)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*