NO.
12-05-00343-CV

                                

IN THE COURT OF APPEALS

 

TWELFTH COURT OF APPEALS DISTRICT

 

TYLER, TEXAS

 

                                                                                    

§          APPEAL
FROM THE 273RD

 

 

IN RE: J.P.D.F.,        §          JUDICIAL
DISTRICT COURT OF

A CHILD

 

§          SHELBY
COUNTY, TEXAS

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 

 



MEMORANDUM OPINION

            Appellant
Anna Franklin appeals the trial court’s final decree of divorce.  On appeal, Anna presents one issue
challenging certain orders relating to the child of the marriage.  We affirm.

 

Background

            Anna
and John Franklin were married on May 20, 1995 and are the parents of one
child, J.P.D.F., born prematurely on December 7, 2001.  On January 4, 2005, John filed an amended
petition for divorce, requesting that both parents be appointed joint managing
conservators.  John also requested that
he be granted the exclusive right to designate the primary residence of the
child and that Anna be ordered to pay child support.  In her counter petition for divorce, Anna
also requested that both parents be appointed joint managing conservators.  Anna asked that she be granted the exclusive
right to designate the primary residence of the child and that the residence
should be restricted to the State of Texas. 
Anna requested that John be ordered to pay child support and spousal
maintenance.  Further, Anna made claims
on the community estate for reimbursement and economic contribution. 








            The
parties agreed to mediation and settled some issues.  Anna and John agreed that J.P.D.F.’s
residence would be restricted to Travis County and contiguous counties or
Shelby County and contiguous counties, or within one hundred miles of the
residence of the parent who did not have the right to determine the child’s
domicile.  Regarding the child, Anna and
John agreed that the only issue would be J.P.D.F.’s primary residence. 

            After
a final trial in July 2005, the trial court filed a final decree of divorce
that, among other orders,  appointed Anna
and John as joint managing conservators of J.P.D.F.  The trial court ordered that, due to J.P.D.F.’s
young age and his best interest, a modified possession order applied to all
periods of possession on or after the date of the final decree of divorce until
August 14, 2007.  In the modified
possession order, Anna and John each had the right to possession of the child
on alternate two week periods with birthdays and holidays divided between the
parents.  During the time of the modified
possession order, John was granted the exclusive right to designate J.P.D.F.’s
primary residence within Shelby County, Texas and contiguous counties or within
one hundred miles of Anna’s residence. 
Beginning August 15, 2007, a standard possession order would take
effect.  At that time, Anna would have
the exclusive right to designate J.P.D.F.’s primary residence within Travis
County, Texas and contiguous counties or within one hundred miles of John’s
residence.  This appeal followed.

Report of
Social Study

            As
part of her argument, Anna quoted from sections of a report prepared by Cindy
Hutchins and attached that report as an exhibit to her brief.  The trial court ordered Hutchins to prepare a
social study of J.P.D.F.’s circumstances and condition and of Anna’s and John’s
homes.  According to the clerk’s and
reporter’s records, Hutchins’s report was not filed with the trial court or
introduced as evidence in the trial. 
Texas Rule of Appellate Procedure states that the appellate record
consists of the clerk’s record and, if necessary to the appeal, the reporter’s
record.  Tex. R. App. P. 34.1. 
An appellate court cannot consider an item that is not a part of the
record on appeal.  Kaman v. State,
923 S.W.2d 129, 132 (Tex. App.–Houston [1st Dist.] 1996, no pet.).  Further, we cannot consider documents
attached to briefs unless they were before the trial court and are part of the
record.  Allen v. Auto. Ins.
Co., 892 S.W.2d 198, 200 (Tex. App. –Houston [14th Dist.] 1994, no
writ).  Because Hutchins’s report was not
a part of the record, we cannot consider it on appeal. 

 

 

Right to
Establish Primary Residence of Child

            As
part of her sole issue, Anna contends that the trial court abused its
discretion by appointing John as the joint managing conservator with the
exclusive right to designate J.P.D.F.’s primary residence and that this
provision was not in the child’s best interest. 
John disagrees.

Applicable Law

            In
determining conservatorship and possession, the best interest of the child
shall be the primary consideration.  Tex. Fam. Code Ann. § 153.002 (Vernon
2002).  The trial court has wide latitude
in determining the best interest of a child, and the decision of the trial
court will be reversed only when it appears from the record as a whole that the
court has abused its discretion.  In
re Marriage of Stein, 153 S.W.3d 485, 488 (Tex. App.–Amarillo 2004, no
pet.).  The test for abuse of discretion
is whether the trial court acted without reference to any guiding rules or
principles.  Worford v. Stamper,
801 S.W.2d 108, 109 (Tex. 1990).  In
other words, the test is whether the trial court’s actions were arbitrary or
unreasonable.  Id.  Under this standard of review, legal and
factual sufficiency of the evidence, although not independent grounds for
asserting error, are relevant factors in assessing whether the trial court
abused its discretion.  Seidel v.
Seidel, 10 S.W.3d 365, 368 (Tex. App.–Dallas 1999, no pet.).  When there is some evidence of a substantive
and probative character to support the trial court’s decision, no abuse of
discretion occurs.  In re Marriage
of Jeffries, 144 S.W.3d 636, 639 (Tex. App.–Texarkana 2004, no pet). 








            In
rendering an order appointing joint managing conservators, the trial court
shall designate the conservator who has the exclusive right to determine the
primary residence of the child (the “primary” conservator).  Tex.
Fam. Code Ann. § 153.134(b) (Vernon Supp. 2006).  The trial court shall consider the
qualifications of the parties without regard to their marital status or to the
sex of the party or the child in determining the terms and conditions of
conservatorship and possession of the child. 
Tex. Fam. Code Ann. §
153.003 (Vernon 2002).  Although Holley
v. Adams involved termination of parental rights, at least two courts
have determined that the Holley factors are appropriate in
determining the best interest of the child in suits affecting the parent-child
relationship.  See In re C.R.O.,
96 S.W.3d 442, 451 (Tex. App.–Amarillo 2002, pet. denied); Yavapai-Apache
Tribe v. Mejia, 906 S.W.2d 152, 168 (Tex. App.–Houston [14th
Dist.] 1995, no writ). 

            The
Holley factors include (1) the desires of the child; (2) the
emotional and physical needs of the child now and in the future; (3) the
emotional and physical danger to the child now and in the future; (4) the
parental abilities of the individuals seeking custody; (5) the programs
available to assist these individuals; (6) the plans for the child by these
individuals; (7) the stability of the home; (8) the acts or omissions of the
parent that may indicate the existing parent-child relationship is not a proper
one; and (9) any excuse for the acts or omissions of the parent.  Holley v. Adams, 544 S.W.2d
367, 371-72 (Tex. 1976).  This list is
not exhaustive, but simply indicates considerations that have been or could be
pertinent.  Id.  However, the best interest of the child does
not require proof of any unique set of factors nor limit proof to any specific
factors.  In re D.M., 58
S.W.3d 801, 814 (Tex. App.–Fort Worth 2001, no pet.).  The Holley test focuses on the
best interest of the child, not the parent’s best interest. Dupree v.
Texas Dep’t of Protective & Regulatory Servs., 907 S.W.2d 81, 86 (Tex.
App.–Dallas 1995, no writ).  

Analysis

            We
review the trial court’s order granting John the exclusive right to designate
J.P.D.F.’s primary residence until August 14, 2007 under an abuse of discretion
standard and using the Holley factors to determine the child’s
best interest.  We note that the parents
had lived in Austin since before J.P.D.F. was born and that the child was
hospitalized for more than two months after his birth.  In 2004, John and Anna agreed to move to
Center because John got a position as the high school assistant principal in
the Center Independent School District. 
At the time of trial, John was living in Center and stated that he would
be the assistant principal of the middle school next year.  Anna still lived in Austin in the family home
and was employed by a public broadcasting television station in Austin. 

Desires of the child

            At
the time of trial, J.P.D.F. was three and one-half years old and there was no
evidence regarding his desires.  However,
one witness testified that her “gut” feeling was that the child wanted to be
with his mother.

The emotional and physical needs of
the child now and in the future

            Anna
testified that J.P.D.F. had some lagging motor skills on one side of his
body.  She further stated that he had
been interviewed for the Head Start program in Austin, but was no longer a
participant in the Easter Seals program. 
According to Anna, J.P.D.F. liked to garden, help her around the house,
play with blocks and balls, and do artwork. 
John stated that he and J.P.D.F. go fishing, read, play games, and play
with balls.  Cindy Hutchins, the director
of the Shelby County Children’s Advocacy Center, was a licensed professional
counselor and was ordered to conduct a social study, visiting both John and
Anna.  No one mentioned to Hutchins that
J.P.D.F. had a learning disability and, from her observations, he appeared to
be a normal, sharp, bright boy. Although Anna’s brief stated that J.P.D.F. was
a fragile child who required special treatment, there was no evidence in the
record of his fragility or need for special medical or educational treatment.
Anna’s brief also stated that J.P.D.F.’s special needs could not be met in
Center, but there was no evidence to support that contention. 

The emotional and physical danger to
the child now and in the future

            There
was some testimony regarding Anna’s postpartum depression or psychosis shortly
after J.P.D.F.’s birth and her two psychiatric hospitalizations.  However, John never believed that Anna posed
a danger to J.P.D.F., and Hutchins did not base her opinions on Anna’s
postpartum depression or psychosis.  John
testified that, in their last exchange of possession of J.P.D.F., Anna believed
that J.P.D.F. was not well enough to travel. 
Both Anna and John testified that the problems with the exchange
escalated until at least one attorney and the police became involved.  John Manual Gonzales, a television and film
producer who had worked with Anna, stated that, during a movie shoot in October
2004, J.P.D.F. was running outside in the parking lot while Anna filmed.  Marie Claire Fleming, the director of the
facility where Anna filmed the movie, also witnessed J.P.D.F. running around
the parking lot one night.  Anna admitted
that, during the filming in October 2004, her schedule was more hectic and
unstructured than normal.  Michael
Stewart Harris, a friend of both Anna and John, stated that, although there was
a suggestion that John left J.P.D.F. unsupervised at Anna’s house, he denied
that he discovered J.P.D.F. wandering in the front yard while John was
asleep.  Harris stated that he was at
Anna’s house and that, while John slept, he babysat the child.

The parental abilities of the parents
and the stability of the home

            John
stated that, prior to their marriage, he and Anna agreed that one of them,
probably Anna, would stay home with their child.  John believed that he should be the primary
conservator because he had a very stable lifestyle with a structured day and
night routine.  After J.P.D.F. was born,
John visited him every day and, during Christmas vacation, he visited the child
several times a day.  John had a master
of education in education administration. 
He began the program in the summer of 2001 and completed it in May 2003.

            Anna
stated that she should be the primary conservator because she had been J.P.D.F.’s
primary caregiver his “entire life.” 
Anna testified that John did not have a lot of time to spend with
J.P.D.F. because he was in graduate school and that he visited the child once a
day in the hospital. She stated that she had a routine for J.P.D.F.  She admitted that she took J.P.D.F. to
daycare while their house was being remodeled or she was unpacking and that the
latest he stayed was 10:00 p.m. Anna also admitted that, from February 2004 to
August 2004, the daycare records showed numerous days when J.P.D.F. stayed at
the daycare from ten to thirteen hours. 
Anna stated that John never complained about a lack of structure during
the marriage.  Anna admitted that she had
some college, but never received a degree. 
Anna testified that she had been employed in the television and film
industry since 1981.  Hutchins stated
that Anna told her she was not working at the present.  John also stated that Anna did not work
regularly a “good deal of the time.” 

            Hutchins
concluded that John was the more stable parent, emotionally, vocationally, and
financially.  However, Hutchins did not
have any evidence strong enough to warrant Anna losing the right to have
J.P.D.F. live primarily with her. 
Hutchins visited Anna at the designated time, about 1:00 p.m.  However, Anna was not ready for the social
study.  Hutchins stated that the house
was beautiful and in order and the housekeeper informed her that Anna was in
the shower and would be down later. 
Hutchins had to wait approximately thirty minutes before Anna presented
herself for the interview.  Hutchins
stated that Anna and John had an agreement that Anna was to be the primary
caretaker of J.P.D.F.  That was part of
her reason for stating that it was in J.P.D.F.’s best interest that he remain
primarily with Anna. 

            Richard
Cronshey, a person who had taught with John, believed that John would be the
better parent because he offered J.P.D.F. stability and a daily routine.  However, he stated that both Anna and John
were good parents.  Michael Stewart
Harris testified that he believed John would be the better parent until Anna
took care of her problems.  John Manual
Gonzales stated that he did not believe Anna’s house was the best place for
J.P.D.F. because she did not offer a structured lifestyle. According to
Gonzales, J.P.D.F. would run until he was exhausted and did not have set times
to eat or for bed.  Also, the child
seemed to spend a majority of the time in daycare and Gonzales did not observe
a very “motherly” relationship.  Cynthia
Rubin, a friend of Anna’s and a perinatal nurse, testified that Anna was a
wonderful loving and caring mother. 
Rubin testified that John was more “high strung” as a parent and was not
as comfortable with a toddler.

The plans for the child

            John
stated that J.P.D.F. was enrolled at a Methodist church daycare and that,
during the school year, J.P.D.F. generally accompanied him to school events
after work.  However, on football nights,
John had obtained a babysitter for J.P.D.F. 
Later, John anticipated that J.P.D.F. would join him at those
events.  Anna stated that she had three
scenarios for herself after the divorce. 
The first plan was to remain in her home, have a roommate, and continue
working at the television station, but arranging it around J.P.D.F.’s
schedule.  Anna’s second plan was for her
sister to move in with her and help out more. 
Her third scenario was to sell the house, but it was the last thing she
wanted because it would disrupt J.P.D.F.’s life the most.

The acts or omission of the parent that may indicate the existing
parent-child relationship is not proper and any excuse for those acts or
omissions

 

            John
stated that Anna became irrational during times of stress and described two
incidents that occurred between Anna and his father after his mother died in
August 2004.  John stated that Anna’s
behavior was irrational and vehement towards his father, but admitted that he
did not witness one incident.  From
mid-October 2004 to November 18, J.P.D.F. stayed with John in Center.  John testified that, on November 18, he did
not know Anna was in Texas or that she was going to pick up J.P.D.F.  When he went to the day care to pick up
J.P.D.F., he was told that Anna picked the child up at nine o’clock that morning.  John testified that he tried to call Anna and
her mother many times and left multiple messages.  According to John, Anna returned his
telephone calls at 8:30 p.m., stating that she had taken J.P.D.F. to a
pediatrician in Austin, that his arm was injured as if it had been wrenched out
of place, that he had bite marks, and that she was concerned with his
wellbeing.  John admitted that J.P.D.F.
was bitten at the daycare, but stated that the daycare had not recommended
further medical attention.  According to
John, x-rays taken by the pediatrician showed no injury.  He denied refusing to pay for any doctor’s
bill and stated that he was willing to pay any of J.P.D.F.’s bills if he were
sent an invoice from the doctor’s office.

            In
December 2004, John was contacted by the Texas Department of Family and
Protective Services (the “Department”), informing him that he was under
investigation for possible neglect of his son. 
John testified that the Department found no evidence of any neglect of
J.P.D.F. while in his care.  John stated
that, although he was allowed to talk to J.P.D.F., he was not allowed to see
his son until February 13, 2005.  John
stated that Anna wanted him to visit J.P.D.F. at Kid’s Exchange, a supervised
visitation facility. John did not believe that this was an appropriate setting
for their visit because it would have been stressful for J.P.D.F. John stated
that, after February 2004, he saw J.P.D.F. more frequently, including a visit
lasting about a week in April. 

            John
admitted that, from November 2004 until the mediation in April 2005, he paid
the mortgage and most of the bills, but refused to send Anna cash because he
did not know how she would spend it. 
John contended that he sent Anna a “good bit” of money and that Anna
also charged on his father’s credit card without permission.  He admitted that, by not paying support, he
was in violation of a temporary order obtained by Anna in Travis County.  The evidence showed that the Travis County
trial court ordered John to pay temporary child support in the amount of $1,200
per month and spousal support in the amount of $2,300 per month for a total of
$3,500 per month. However, John’s monthly salary was $2,265.13.  John believed that Shelby County controlled
the divorce case. 

            Regarding
the incidents with John’s father, Anna stated that she attempted to handle the
situations calmly, but that John’s father accused her and screamed at her.  Afterwards, Anna testified that her
relationship with John deteriorated.  She
stated that John was very controlling and manipulative. Prior to the November
18, 2004 incident, Anna had been in New York scouting for a location.  On November 18, Anna traveled to Center and,
after picking J.P.D.F. up from daycare and noting his condition, she took him
to his pediatrician in Austin.  Anna
stated that J.P.D.F.’s arm was “horribly injured” and that he was crying and
complaining.  Anna stated that she
attempted to ascertain what had occurred, but could not.  According to Anna, J.P.D.F.’s pediatrician
suggested that the child sustained a broken collarbone and performed
x-rays.  Anna admitted that there was no
broken collarbone, but that there was an injury.  Anna stated that the pediatrician referred
her to a specialist and she scheduled an appointment.  John’s counsel noted that the pediatrician’s
records stated that no referral was necessary for a pediatric orthopedist and
she was left a message.  Anna claimed
that John refused to pay for the specialist. 

            Anna
abided by the Travis County temporary orders and admitted that, between
November and February, John did not see the child.  In Anna’s opinion, if she allowed John to
have possession of J.P.D.F. in those months, she would not have seen her son
again because John was not abiding by the Travis County order.  She stated that, between November 2004 and
April 2005, John sent her very little money. 
In April 2005, they agreed on a visitation schedule through
mediation.  However, she complained that
John signed up to be the assistant principal during summer school and was “warehous[ing]”
J.P.D.F at daycare instead of spending time with him.  She stated that John repeatedly turned down
opportunities to spend time with J.P.D.F.

            William
Franklin was John’s father and lived in Grand Cane, Louisiana.  Franklin described two conflicts with Anna
during the time of his wife’s death. 
According to Franklin, Anna said he called her a liar and became loud
and forceful.  Because of her behavior,
he did not believe that she should drive J.P.D.F. to Center and did not allow
her to use his wife’s van to do so. 
Franklin allowed Anna and John to use his credit card for minimal
purchases.  He revoked his permission
after he discovered that Anna had withdrawn $1,800 when he gave her permission
to withdraw only $1,000.  On another
credit card, Franklin discovered approximately eighteen additional charges that
neither he nor John made, including Anna’s dental bill for $900.  He never gave Anna permission to use that
credit card.  Prior to November 18, 2004,
J.P.D.F. had been at Franklin’s house.  Franklin denied that the child’s arm was
hurting or that he showed any injuries.

            Michael
Stewart Harris stated that J.P.D.F. was either at the daycare, at the house, or
with them while he and Anna worked on a film in October 2004.  Most days, Harris took J.P.D.F. to daycare
and picked him up and took him meals two or three times a day.  One night, the daycare called at midnight and
asked that the child be picked up. 
Harris testified that J.P.D.F. would stay at the daycare from before
10:30 a.m. until 11:00 p.m.  In October
2004, Harris stated that he believed Anna was sleep deprived and stated that
she fell asleep at inappropriate times. 
Because of her sleeping behavior, he had concerns regarding J.P.D.F.’s
safety and believed Anna’s mental and/or emotional state was not healthy enough
for her to take care of the child.     

            Sue
Williams was employed at the Wee Learn Baptist daycare in Center and was
familiar with Anna, John, and J.P.D.F. John enrolled J.P.D.F. in the daycare in
September or October 2004. Before lunch one day, Anna picked up J.P.D.F.  On that day, Williams stated that J.P.D.F.
did not look injured, unkempt, or sick, and had been playing as usual.  She did not notice whether he was holding his
arm in a “funny” manner.

            From
the evidence above, the trial court could have found that John was a stable
parent, both emotionally and financially, that he offered a stable home, that
he seemed to meet J.P.D.F.’s emotional and physical needs, and that he was not
a danger to his child.  The trial court could
have found that John was not unreasonable to believe that the Shelby County
case controlled his divorce and that the Travis County support orders were more
than his monthly salary.  The trial court
could have found that, at that time, Anna was not as stable as John,
emotionally or financially.  Moreover,
the trial court was in a better position to determine the best interest of the
child because it faced the parties and witnesses, observed their demeanor, and
had the opportunity to evaluate the claims made by each parent.  Martinez v. Molinar, 953 S.W.2d
399, 403 (Tex. App.–El Paso 1997, no writ). Therefore, we conclude that the
trial court did not abuse its discretion in appointing John as the joint
managing conservator with the exclusive right to designate J.P.D.F.’s primary
residence until August 14, 2007, and that this appointment was in the child’s
best interest.  Accordingly, we overrule
the portion of Anna’s sole issue regarding designation of J.P.D.F.’s primary
residence. 

 

Modified
Possession Order

            As
part of her sole issue on appeal, Anna also argues that the trial court abused
its discretion by ordering a modified possession order that changes possession
of J.P.D.F. between the parties every two weeks and that this order was not in
the child’s best interest.  John
disagrees.

Applicable Law

            In
determining possession of and access to the child, the best interest of the
child shall be the primary consideration. 
Tex. Fam. Code Ann. §
153.002.  The trial court has wide
latitude in determining the best interest of a child, and the decision of the
trial court will be reversed only when it appears from the record as a whole
that the court has abused its discretion. 
In re Marriage of Stein, 153 S.W.3d at 488.  The test for abuse of discretion is whether
the trial court acted without reference to any guiding rules or
principles.  Worford, 801
S.W.2d at 109. 

            Joint
managing conservatorship does not require the award of equal or nearly equal
periods of physical possession of and access to the child to each of the joint
conservators.  Tex. Fam. Code Ann. § 153.135 (Vernon 2002).  The standard possession order constitutes a
presumptive minimum amount of time for possession of a child by a parent named
as a joint managing conservator who is not awarded the exclusive right to
designate the primary residence of the child (the “managing” conservator).  Tex.
Fam. Code Ann. § 153.137 (Vernon Supp. 2006).  The trial court shall render an order that
grants periods of possession of the child as similar as possible to those
provided by the standard possession order if the standard order is unworkable
or inappropriate.  Tex. Fam. Code Ann. § 153.253 (Vernon
2002).  In ordering the terms of
possession of a child under an order other than a standard possession order,
the court shall be guided by the guidelines established by the standard
possession order and may consider the age, developmental status, circumstances,
needs, and best interest of the child, the circumstances of the managing
conservator and of the parent named as a possessory conservator, and any other
relevant factor.  Tex. Fam. Code Ann. § 153.256 (Vernon 2002). 

Analysis

            We
note that the trial court stated that it made a “complicated” ruling because it
was important for both parents to have significant time with the child while
not completely sacrificing their careers. 
Moreover, the trial court, in its order, stated that it modified the
possession order due to J.P.D.F.’s young age. 
The alternating two week possessions ordered by the trial court would
end August 14, 2007, the approximate date J.P.D.F. would begin
kindergarten.  Anna, as the managing
conservator, was given more, not less, time with J.P.D.F. than that required in
a standard possession order, the presumptive minimum.  See Tex.
Fam. Code Ann. § 153.137.  There
was little evidence regarding the danger to J.P.D.F. of traveling between the
parents every two weeks.  John stated
that, while it was not in J.P.D.F.’s best interest to be on the road for six
hours between Austin and Center, it likewise was not in his best interest to
see his parents less frequently because of the distance between them. 

            Regarding
the respective careers of the parents, John testified that, in the spring
before trial, he made no attempts to find employment in the Austin or Travis
County area.  John stated that his
remaining in Center was in J.P.D.F.’s best interest because his son thrived
there and that it was a good place to raise a child.  Anna stated that it would be difficult to
find a position in television or film production in Center rather than a large
urban area.  For career reasons, neither
party wanted to move.  The trial court
was allowed to consider the child’s age and development and the parents’
circumstances in ordering terms of possession that differed from the standard
possession order.  See Tex. Fam. Code Ann. § 153.256.  Considering the young age of the child and
the trial court’s concern that both parents see the child frequently, yet not
sacrifice their careers, we conclude that the trial court did not abuse its
discretion in ordering a modified possession order until August 14, 2007, and
that the order was in the best interest of the child.  Accordingly, we overrule the portion of Anna’s
sole issue regarding the modified possession order. 

 

Disposition

            The
judgment of the trial court is affirmed.

 

 

                                                                                                     JAMES T. WORTHEN    

                                                                                                                 Chief Justice

 

 

Opinion
delivered September 29, 2006.

Panel consisted of Worthen,
C.J., Griffith, J., and Hoyle, J.

 

 

 

 

 

 

 

 

 

 

(PUBLISH)