# NO. 12-13-00163-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE 307TH* |
| *L.M.A.,* | § | *JUDICIAL DISTRICT COURT* |
| *A CHILD* | § | *GREGG COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

M.A. appeals the termination of her parental rights. In two issues, M.A. challenges the order of termination. We affirm.

### BACKGROUND

M.A. is the mother of one child, L.M.A., born June 24, 2012.[1] On June 26, 2012, the Department of Family and Protective Services (the Department) filed an original petition for protection of the child, for conservatorship, and for termination of M.A.'s parental rights. The Department also stated that there were aggravated circumstances and requested waivers of the requirements to develop a service plan and to make reasonable efforts for return of the child to the parent. After an adversary hearing, the Department was appointed the child's temporary managing conservator, and M.A. was appointed temporary possessory conservator with limited

---

[1] According to the trial court's findings of fact, there were two alleged fathers of L.M.A. and the Department filed an amended petition seeking to terminate both their parental rights. At the conclusion of the trial, the trial court found, by clear and convincing evidence, that both alleged fathers, S.J.M. and R.A.M., after being served with citation, had not responded by timely filing an admission of paternity or a counterclaim for paternity under Chapter 160 of the Texas Family Code prior to the final hearing. Further, the trial court found, by clear and convincing evidence, that L.M.A. was under one year of age at the time the petition for termination of the parent-child relationship was filed and that the alleged fathers had not registered with the paternity registry under Chapter 160. The trial court also found, by clear and convincing evidence, that termination of the parent-child relationship, if any existed or could exist, between L.M.A. and the alleged fathers, S.J.M. and R.A.M., was in the child's best interest. Accordingly, the trial court ordered that the parent-child relationship, if any existed or could exist, between L.M.A. and the alleged fathers, S.J.M. and R.A.M., be terminated. The alleged fathers are not parties to this appeal.

access to and possession of the child, specifically one hour of supervised visitation per week. M.A. was also obligated to pay child support.

Further, the trial court ordered that the requirements for the Department to develop a service plan and make a reasonable effort to return the child to M.A. be waived due to aggravated circumstances. The court found that the aggravated circumstances were that M.A. had her parent-child relationship terminated with respect to another child based on a finding that her conduct was in violation of Section "161.001(1)(D) or (E)" of the Texas Family Code.

The case proceeded to trial on April 23, 2013. After the conclusion of the trial, the trial court found, by clear and convincing evidence, that M.A. had engaged in one or more of the acts or omissions necessary to support termination of her parental rights under Section 161.001(1), subsection (M). The trial court also found that termination of the parent-child relationship between M.A. and L.M.A. was in the child's best interest. Therefore, the trial court ordered that the parent-child relationship between M.A. and L.M.A. be terminated. After a timely request from M.A., the trial court filed findings of fact and conclusions of law. This appeal followed.

### TEMPORARY ORDERS AND AGGRAVATED CIRCUMSTANCES

In her first issue, M.A. argues that the evidence is legally and factually insufficient to support the initial removal of the child, and that there is insufficient evidence that the trial court waived the requirement of a service plan pursuant to Section 262.2015 of the Texas Family Code. More specifically, she claims that the docket sheet failed to reflect a hearing pursuant to Section 262.201, temporary orders, or a finding of aggravated circumstances supporting waiver of a service plan. Thus, M.A. contends the trial court abused its discretion and requests that the trial court's judgment be reversed or, in the alternative, that this case be abated until the record can be supplemented to include any omitted temporary orders and/or any findings of aggravated circumstances at the time of the initial removal of the child.

The Department explained in its brief that the clerk's record has been supplemented to include a temporary order. The supplemental clerk's record shows that an order was filed, stating that a full adversary hearing was held on July 6, 2012, pursuant to Section 262.205 of the Texas Family Code. As noted above, at the conclusion of the hearing, the trial court found that, "[h]aving examined and reviewed the evidence, including the sworn affidavit accompanying the petition and based upon the facts contained therein," there is sufficient evidence to "satisfy a

person of ordinary prudence and caution" to support removal of the child from M.A. The trial court's findings supported removal of L.M.A. under Section 262.201(b) of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 262.201(b) (West Supp. 2012).

The trial court also ordered that the requirements to develop a service plan and to make a reasonable effort to return the child to M.A. be waived due to aggravated circumstances. The trial court found that the aggravated circumstances were that M.A. had her parent-child relationship terminated with respect to another child based on a finding that her conduct was in violation of Section "161.001(1)(D) or (E)" of the Texas Family Code. These findings tracked the language of Section 262.2015, subsections (a) and (b)(5), of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 262.2015(a), (b)(5) (West Supp. 2012).

Because the trial court held a full adversary hearing and made appropriate findings, we conclude that the evidence is legally and factually sufficient to support the initial removal of the child, and that there is sufficient evidence to waive the requirements of a service plan and reasonable efforts to return the child due to aggravated circumstances. Accordingly, we overrule M.A.'s first issue.

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.—Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.—Texarkana 1995, writ denied). Because a termination action permanently sunders the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2012); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.—Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. TEX. FAM. CODE ANN. § 161.001(1) (West Supp. 2012); *Green v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.—El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(2) (West Supp. 2012); *In re J.M.T.*, 39 S.W.3d at 237. Additionally, both

3

elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

Due process requires a petitioner to justify termination by clear and convincing evidence because termination is such a drastic remedy. *In re J.M.T.*, 39 S.W.3d at 238. The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established" TEX. FAM. CODE ANN. § 101.007 (West 2008). There is a strong presumption that the best interest of the child is served by preserving the parent-child relationship. *Wiley*, 543 S.W.2d at 352; *In re J.M.T.*, 39 S.W.3d at 240. Thus, the burden of proof is upon the person seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

## STANDARD OF REVIEW

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id.* at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

This standard retains the deference an appellate court must have for the fact finder's role. *In re C.H.*, 89 S.W.3d at 26. Additionally, the trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.—Houston [1st Dist.] 1997, pet. denied). Thus, our review must not be so rigorous that only fact findings established beyond a reasonable doubt could withstand review. *In re C.H.*, 89 S.W.3d at 26.

4

## BEST INTEREST OF THE CHILD

In her second issue, M.A. argues that the evidence is factually insufficient to support a finding that termination of her parental rights was in the best interest of the child. In determining the best interest of the child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

This list is not exhaustive, but simply indicates considerations that have been or could be pertinent. *Id.* However, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.–Fort Worth 2001, no pet.). The *Holley* test focuses on the best interest of the child, not the parent's best interest. *Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). We apply the *Holley* factors below.

*The desires of the children*

At the time of the trial, M.A. was ten months old, and therefore too young to express her desires.

*The emotional and physical needs of the children now and in the future*

LaHoma Pittman, a conservatorship worker for the Department, stated that L.M.A. was in a foster home and had reached all of her developmental milestones. She testified that L.M.A. was a very happy, vibrant baby. Pittman stated that L.M.A. had been diagnosed with acute rhinitis and allergies, but that she was getting treatment. However, she said, L.M.A. would need continued medical supervision. Lisa Henson, L.M.A.'s foster mother, stated that she has had L.M.A. since she was two days old. She testified that L.M.A. had allergies that began when she was about six weeks old. Henson stated that L.M.A. was prescribed oral medications for her allergies when she was six months old, but she has continued to have problems. She testified that L.M.A. has been prescribed a nasal spray and breathing treatments, as needed. Henson stated that L.M.A. goes to day care.

5

*The emotional and physical danger to the children now and in the future*

Kaila Rountree, an investigator with the Department, stated that after interviewing M.A. at the hospital when L.M.A. was born, she checked M.A.'s history with the Department. She discovered that M.A. had over twenty cases in which the Department found reason to believe or was unable to determine for abuse and neglect. These cases began in 1993 through 2009 and involved eleven children, including L.M.A. According to Rountree, M.A. had a history of not being able to take responsibility for her actions. She did not believe L.M.A. was safe if she left the hospital with M.A. According to Pittman, M.A. had her parental rights terminated to six other children. All of the orders of termination regarding these children were offered and admitted at trial.

*The parental abilities of the parent seeking custody*

Rountree testified that M.A. told her at the hospital, after L.M.A. was born, that she had received prenatal care at various hospitals, because she moved around a lot. M.A. also told her that she did not know she was pregnant until she felt the baby move. According to Rountree, M.A. stated that she went to Good Shepherd Hospital and was told that she suffered from cysts. She also stated that M.A. refused to sign a medical release so that Rountree could look at her prenatal records.

Pittman testified that M.A. brought toys, clothing, and some food during her visitations with L.M.A. However, she said, some of the clothes were not appropriate because they were the wrong size, too worn, or had an odor. Pittman stated that M.A. did not consistently make her visitations with L.M.A. Her records show that beginning August 13, 2012, M.A. could have had forty-one visitations with her child. However, she said, M.A. missed nineteen visitations because of sickness, previous appointments, or confusion about the time of her visitation. Pittman testified that during her visitations, M.A.'s behavior was very erratic. She described M.A. as unable to be still, and said that she seemed to be hyper, upset, irritable, and agitated while holding the child. Pittman stated that M.A. demonstrated appropriate behavior at some of the later visitations, but at some visitations, M.A. would constantly complain or be "real negative." She said that if L.M.A. came to a visitation with a runny nose or congestion, M.A. would complain that the child was sick again, that the Department was not taking care of her, or that she was being abused. Pittman would explain to M.A. that L.M.A. had been to the doctor and that

the foster parents were addressing all of her medical needs. In her opinion, M.A. was overreacting.

Pittman testified that during a November visitation, M.A. changed her and discovered a discoloration on her upper left thigh. Pittman took pictures of the discoloration and asked an investigator and another coworker to look at it. According to Pittman, the investigator stated that the discoloration was not a bruise, and was caused from rubbing against the car seat. She stated that by the end of the visit, the discoloration had disappeared. Pittman testified that M.A. was "very upset" and said that she was "not buying what [they were] saying," and that the discoloration was a bruise. Pittman stated that these visitations could be stressful for L.M.A. and that the child did not appear to be attached to M.A. or demonstrate parental separation anxiety when M.A. left a visitation.

Henson testified that M.A. sent clothes that, at times, were far too big with elastic that would be "dry rotted," and that had pest droppings in the bag. Further, some of the clothes that M.A. changed L.M.A. into at visitations were not clean.

M.A. told Rountree that she received prenatal care at a hospital in Shreveport, Mother Frances Hospital, and Good Shepherd Hospital. M.A. stated that she went to Good Shepherd Hospital in the fall of 2011 regarding ovarian cysts and was tested for pregnancy. She was tested for pregnancy in August, September, and October 2011, and all the tests were negative. She did not discover she was pregnant until the baby began to move between November 2011 and January 2012.

M.A. testified that Pittman asked her to stop giving clothes even though she had diapers. She stated that no one complained to her about the clothes she gave L.M.A. and that it was her right as a parent to give her what she saw fit. M.A. admitted that some of the clothes were hand-me-downs. She explained that she missed visitations because she was in the hospital, was sick with the flu or an upper respiratory infection, or had car trouble. She stated that at visitations, L.M.A. reaches for her, recognizes her, and plays with her. She explained that L.M.A. laughs and sings with her.

M.A. testified that she was concerned about a child safety seat used to transport L.M.A. She stated the seat was improperly buckled into the vehicle and thus, unsafe. She also claims that L.M.A. was perfect after she was born and that the pediatrician at the hospital said that she had no problems. M.A. also complained about the bruise that Pittman stated was the result of the car

seat. She stated that the Department could not explain how the bruise occurred or how she received marks on her neck or back. M.A. testified that she loved L.M.A. and that if she had her, the child would not be sick every day or want for anything. She would ensure that L.M.A. was not sick by keeping her clean and not exposing her to people with germs in a day care.

*The plans for the children by the parent*

According to Pittman, the Department's plan is for M.A.'s parental rights to be terminated and for L.M.A. to be adopted. M.A. stated that she planned to raise L.M.A. quietly and without the Department's interference "at all." She testified that she planned to go to the country with horses and gardens and "not a lot of people." She would like to raise her daughter in an environment with her grandchildren in the country without "somebody calling [the Department] because they're mad or because of this or because of that." If she obtained custody of L.M.A. now, she would take her to her son's home. However, M.A. did not know if that son had ever been arrested for domestic violence, assault, or disturbing the peace.

*The stability of the home*

Rountree stated that M.A. first told her that she had been living at a church in Longview for over a year. She asked M.A. where she would go when she left the hospital. M.A. told Rountree that she would be staying in her fifth wheel, with a friend, or with family. However, Rountree stated that M.A. refused to give her those addresses. Then, she said, M.A. told her that she had been living back and forth between Texas and Louisiana. Pittman testified that M.A. gave her several locations where she was living, but no addresses. She stated that M.A. was "intentionally evasive" about where she had been living. Pittman stated that M.A. never furnished her with any information indicating that she had a source of income. She did not believe M.A. was able to provide L.M.A. with a safe and stable environment.

M.A. stated that she filed for disability and had an ongoing court case in another state regarding a chemical exposure that occurred three years ago. Additionally, she claims that she has breathing, back, and seizure problems. However, she admitted that she did not have any regular income and supported herself with odd jobs. She also received assistance from church members, family, and friends.

M.A. admitted that at the time of L.M.A.'s birth, she was living at an address in Kilgore and a Baptist church. She told Rountree that she could live at the church, her grandmother's mobile home in Kilgore, or at the women's shelter because it was a safe place. M.A. admitted

that she was incarcerated for approximately twenty days and then was ready, willing, and able to have L.M.A. placed with her. M.A. testified that at the time of trial, she was living in Marshall with her oldest son in a four bedroom brick house. She admitted that she just began living there, but said that it was an appropriate place to raise L.M.A. M.A. testified that she traveled to be with, visit, and help her children. She explained that "it's not that [she doesn't] have a set home" and said that she could live anywhere. However, she "just [hasn't] set grounds to where [she wants] to be yet." According to M.A., the baby was her daughter, she was an American, and she had the constitutional right to live or to do whatever she wanted to do or be wherever she wanted to. She admitted having a regular job about two to three years ago.

*The acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one*

Rountree stated that she was assigned to M.A. after a report came into the office that she had given birth to a girl. She testified that the report included concerns that M.A. had untreated mental health diagnoses, a history of drug use, and Department history. In response, Rountree said, she contacted M.A. at Good Shepherd Hospital in Longview, Gregg County, Texas, on June 25, 2012. When Rountree asked M.A. where she would be staying with the child once she left the hospital, M.A. told her that she would go wherever she wanted, and then stated that she would be staying in her fifth wheel, with a friend, or with family. However, Rountree said, M.A. refused to give her the addresses so that she could check these homes.

Rountree stated that M.A. told her she was not smoking marijuana, but refused to submit to a current drug test. Rountree stated that during the interview, M.A. was "very erratic," giving vague answers, talking fast, pacing the room, and sitting down and standing up. She testified that M.A. called someone during their conversation a few times, yelling about how the Department had "wronged her." Rountree stated that at one point, M.A. shoved her papers toward Rountree saying, "Here, you name the baby. You stay up all night and feed her. Who wants a little baby, anyway?" She stated that she observed the baby, who appeared healthy and was in clothes that she believed M.A. had brought. She also saw a car seat in the room. However, Rountree stated that M.A. was concerned about a rash on the child and confronted the physician. She stated that the physician said that all new babies get it and it was "not a big deal." According to Rountree, M.A. seemed convinced that the hospital had given the baby a rash. Rountree testified that M.A. told her that she had been diagnosed with "bipolar," but that she was not taking any medication. However, she admitted occasionally taking medications for her seizures.

Pittman testified that M.A.'s parental rights to another child, R.M.T., born September 28, 1996, were terminated because the court found by clear and convincing evidence that M.A. had knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered her physical or emotional wellbeing, and engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered her physical or emotional wellbeing. Pittman also stated that M.A. was incarcerated at the time of the adversary hearing, having been convicted of theft on June 29, 2012. She testified that M.A. was required to pay child support, but that the attorney general's office showed no report of any payment for L.M.A.

Pittman did not believe that M.A. could meet the needs of this child and that living with M.A. would not be in the child's best interest. She also stated that M.A.'s history with the Department, history of abuse or violence in the family, and lack of any indication that M.A. had taken any actions to improve her situation or stability led the Department to believe termination of her parental rights was in the best interest of the child.

M.A. stated that on the day Rountree interviewed her, she was hysterical because of some medical complications she was suffering from L.M.A.'s birth, including an infection. She also stated that L.M.A. had a rash and later discovered it occurred due to her formula that also caused her to violently vomit or have diarrhea. M.A. testified that she informed Rountree that she did not smoke marijuana. She did not understand why she was being "interrogated." M.A. admitted telling Rountree that if "she was so concerned about [her] child and what [she] bought and God gave [her] . . . that why didn't [Rountree] take her home herself and raise her and name her and be her mother." According to M.A., she was in so much pain that she could barely get out of bed, and denied pacing the room.

M.A. admitted to having been diagnosed with bipolar disorder and was given medication. However, she stated that the same physician told her subsequently that she did not need to take the medication. She admitted that another doctor in 1997 stated that his diagnostic impressions of her were bipolar disorder, personality disorder, and paranoid and schizoid features. M.A. stated that she had grand mal seizures, that she was currently on medication, and that the seizures were "few and far in between." She admitted to a lengthy history with the Department. She also admitted to having prescriptions for Hydrocodone, Dilantin, antibiotics, breathing medications, and an inhaler.

10

Considering all the evidence in the record, both that in support of and contrary to the trial court's findings, the trial court reasonably could have found that M.A. posed a danger to L.M.A. because she had her parental rights terminated as to six other children, that she had no stable employment or home, that she seemed to overreact to L.M.A.'s allergies and childhood incidents, that her plans for the child were vague and faintly sinister, that she did not provide appropriate clothing for the child, that she did not appear to be bonded to the child and missed many visitations, and that she had untreated mental health issues. Although there is some disputed evidence that M.A. loved L.M.A. and was concerned about her, this evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that terminating M.A.'s parental rights was in the best interest of the child. We hold that the evidence is factually sufficient to support the trial court's finding that termination of M.A.'s parental rights is in the best interest of the child. Therefore, we overrule M.A.'s second issue.

## DISPOSITION

Having overruled M.A.'s first and second issues, we ***affirm*** the judgment of the trial court.

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered September 4, 2013.
*Panel consisted of Worthen, C.J. and Griffith, J.*
*Hoyle, J., not participating.*

(PUBLISH)

11



# COURT OF APPEALS
# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS
# JUDGMENT

## SEPTEMBER 4, 2013

## NO. 12-13-00163-CV

## IN THE INTEREST OF L.M.A., A CHILD

Appeal from the 307th Judicial District Court

of Gregg County, Texas. (Tr.Ct.No. 2012-1255-DR)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J. and Griffith, J.*
*Hoyle, J., not participating.*