# NO. 12-13-00373-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE 115TH* |
| *D.N., R.N. AND C.N.,* | § | *JUDICIAL DISTRICT COURT* |
| *CHILDREN* | § | *UPSHUR COUNTY, TEXAS* |

## *CORRECTED MEMORANDUM OPINION*

The Department of Family and Protective Services filed an unopposed motion to correct our May 30, 2014 judgment, and implicitly our corresponding opinion, to identify the Department as permanent managing conservator instead of temporary managing conservator of the children. We grant the motion, withdraw our May 30, 2014 opinion and judgment, and substitute the following corrected opinion and judgment.

D.N. appeals the termination of her parental rights. In four issues, she challenges the order of termination. We reverse and render with instructions.

## BACKGROUND

D.N.[1] is the mother of D.N.2., born April 14, 2006; R.N., born August 11, 2008; and C.N.2, born November 10, 2012. C.N. is the father of the children and is not a party to this appeal. On April 5, 2013, the Department of Family and Protective Services (the Department) filed an original petition for protection of the children, for conservatorship, and for termination of D.N.'s and C.N.'s parental rights. The Department was appointed temporary managing conservator of the children, and D.N. was appointed temporary possessory conservator with limited rights and duties.

---

[1] The parents and two of the children share the same initials. We will refer to the parents as D.N. and C.N., and to the children as D.N.2 and C.N.2.

At the conclusion of the trial on the merits, the trial court found, by clear and convincing evidence, that D.N. had engaged in one or more of the acts or omissions necessary to support termination of her parental rights; more specifically, Texas Family Code Section 161.001(1), subsections (D) and (E). The trial court also found that termination of the parent-child relationship between D.N. and the children was in the children's best interest. Based on these findings, the trial court ordered that the parent-child relationship between D.N. and the children be terminated. This appeal followed.

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West 2014); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. TEX. FAM. CODE ANN. § 161.001(1) (West 2014); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(2) (West 2014); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014). The burden of proof is upon the party seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

STANDARD OF REVIEW

When confronted with both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id*.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).

## TERMINATION OF D.N.'S PARENTAL RIGHTS

In her first, second, third, and fourth issues, D.N. contends the evidence is legally and factually insufficient to terminate her parental rights pursuant to Texas Family Code Section 161.001(1), subsections (D) and (E).

### Termination under Subsection 161.001(1)(D)

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed, or knowingly allowed the child to remain, in conditions or surroundings that endanger the physical or emotional well being of the child. TEX. FAM. CODE ANN. § 161.001(1)(D) (West 2014). Subsection (D) addresses the child's surroundings and environment, rather than parental conduct. *In re C.L.C.*, 119 S.W.3d 382, 392

3

(Tex. App.—Tyler 2003, no pet.). The relevant time frame to consider in determining whether there is clear and convincing evidence of endangerment is before the child was removed. ***Ybarra v. Tex. Dep't of Human Servs.***, 869 S.W.2d 574, 577 (Tex. App.—Corpus Christi 1993, no pet.).

When seeking termination under subsection (D), the Department must show that the child's living conditions pose a real threat of injury or harm. ***In re N.R.***, 101 S.W.3d 771, 776 (Tex. App.—Texarkana 2003, no pet.). There must be a connection between the environment and the resulting danger to the child's emotional or physical well being when seeking termination of parental rights under Section 161.001(1)(D). ***Id.*** It is sufficient that the parent was aware of the potential for danger to the child in such environment and disregarded that risk; but if the parent is unaware of a potential risk of endangerment, termination under subsection (D) is not appropriate. *See **Rios v. Tex. Dep't of Family & Protective Servs.***, No. 03-11-00565-CV, 2012 WL 2989237, at *5 (Tex. App.—Austin July 11, 2012, no pet.) (mem. op.); *see also **In re D.C.***, 128 S.W.3d 707, 715 (Tex. App.—Fort Worth 2004, no pet.) (holding that subsection (D) requires knowledge on the part of the parent).

An environment that routinely subjects a child to the probability that he will be left alone because his parents are once again jailed endangers both the physical and emotional well being of a child. ***In re S.D.***, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). But a parent's voluntary, willful, and conscious engagement in conduct that she knows may result in imprisonment is insufficient to support termination of parental rights. *See **In re D.T.***, 34 S.W.3d 625, 636 (Tex. App.—Fort Worth 2000, pet. denied). The commission of an intentional act that results in imprisonment, including violation of community supervision, is not sufficient grounds, standing alone, for termination. ***Mayfield v. Smith***, 608 S.W.2d 767, 771 (Tex. Civ. App.—Tyler 1980, no writ).

### *The Evidence*

The reporter's record of the trial in this case contains thirty-seven pages; the trial testimony comprises twenty-seven of those pages. This record shows that the Department called only one witness: Jennifer Goodson, a Department caseworker. Goodson testified that she was assigned this case "around" April 2013. She did not believe that D.N. had demonstrated an ability to provide a safe and stable housing environment for the children. Nor did she believe that this would change. Goodson testified that she believed termination of D.N.'s parental rights was in the children's best interest. However, she did not relate any facts that formed the basis of her opinion.

4

After Goodson's testimony, the attorney ad litem for the children, without stating any facts to support her conclusion, informed the trial court that she believed termination was in the best interest of the children.

C.N., whose parental rights were terminated in the same proceeding, appeared pro se and testified briefly. His testimony did not relate to the children's conditions or surroundings before their removal.

D.N. disputed the Department's allegations that she allowed her youngest child to become malnourished. She stated that the Department's allegations were not true and "just pulled [] out of the air." She said this case was a "matter of me and my husband not getting along." D.N. testified that she had given birth to her youngest child a month early, that was the reason he was "so skinny," and that she had almost died during his birth. She stated that she took him to the doctor where he was given a "little foot prick test and everything." D.N. also stated that although the child was in foster care, he was still throwing up according to the "papers." She said it was not "okay" that he was still throwing up.

D.N. also disputed the Department's allegations that she left her children alone unsupervised. She said her husband, C.N., was "there" because his mother picked him up. It is not clear whose house D.N. meant when she said "there." She stated further that her husband's mother was at D.N.'s house and called the police, stating that she, D.N., was not there. D.N. testified that she was at a neighbor's house trying to call her preacher's wife to come get her and the children. According to D.N., that is the reason she was arrested for endangerment, but the endangerment charges were dismissed.

C.N.'s mother was previously a joint managing conservator of the children, and the trial court allowed her to testify in narrative form. She stated that she took C.N. to work and decided to go back and see if she could keep the children for Easter. D.N. refused, and told C.N.'s mother that she was not supposed to be on her property. C.N.'s mother said she then left D.N.'s house, parked down the street, and called the police. After the police arrived at D.N.'s house, they brought the children to her and told her that D.N. was going to jail. She also testified she had kept the older children until her husband died. At that time, she believed C.N. and D.N. were "doing better" and gave the children back to them. She said that it was "poor judgment" on her part to give the children back.

5

*Conclusion*

The relevant time frame in determining whether there is clear and convincing evidence of endangerment under subsection (D) is before the child was removed. *See **Ybarra***, 869 S.W.2d at 577. The Department presented no evidence to support its allegations that D.N. allowed her youngest child to become malnourished and that she left the children alone unsupervised before they were removed. The only evidence regarding malnourishment was from D.N., who explained the reasons for her youngest child's weight. She also stated that she had taken him to a doctor and that he was still "throwing up" in foster care.

D.N. also addressed the Department's accusation that the children were left unsupervised. But it is not clear from either her testimony or C.N.'s mother's testimony that the children were left alone in the house. The Department presented no evidence that the children's living conditions posed a real threat of injury or harm. *See **In re N.R.***, 101 S.W.3d at 776. Nor did C.N. testify about the children's conditions or surroundings before they were removed from D.N.

However, the Department argues, the trial court took judicial notice of the file and its contents. The Department contends this evidence demonstrates that D.N. had an extensive history with the Department, that she regularly left her children unattended, that the children often lacked enough food, and that the youngest child's condition was unhealthy. In support of this contention, the Department cites to the trial court's file and the Department's initial affidavit attached to its original petition. A trial court may take judicial notice of the contents of its file, but may not take judicial notice of the truth of any factual allegations contained in its file. *See **In re J.E.H.***, 384 S.W.3d 864, 870 (Tex. App.—San Antonio 2012, no pet.). Thus, in this case, the trial court could properly take judicial notice that the Department filed an affidavit along with its original petition, but could not take judicial notice of the truth of the allegations the Department made in the affidavit. *See **id.***

Based upon the record before us, no reasonable fact finder could have formed a firm belief or conviction that the Department's allegation was true—that D.N. knowingly placed, or allowed her children to remain, in conditions or surroundings that endangered their physical or emotional well being. *See generally **In re K.W.***, 138 S.W.3d 420, 431–32 (Tex. App.—Fort Worth 2004, pet. denied). Therefore, we conclude that the evidence is legally insufficient to support a finding of termination of D.N.'s parental rights under Section 161.001(1)(D) of the Texas Family Code. Accordingly, D.N.'s first issue pertaining to legal sufficiency is sustained. Because we have held

6

that the evidence is legally insufficient to support termination under Section 161.001(1)(D), we need not address D.N.'s second issue pertaining to factual sufficiency. *See* TEX. R. APP. P. 47.1.

**Termination under Subsection 161.001(1)(E)**

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well being of the child. TEX. FAM. CODE ANN. § 161.001(1)(E) (West 2014). The specific danger to the child's well being need not be established as an independent proposition, but may instead be inferred from parental misconduct. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re J.J.*, 911 S.W.2d at 440. Scienter is not required for an appellant's own acts under Section 161.001(1)(E), although it is required when a parent places her child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Finally, the need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *In re N.K.*, 99 S.W.3d 295, 301 n.9 (Tex. App.—Texarkana 2003, no pet.); *In re M.D.S.*, 1 S.W.3d at 200.

"Endanger" means to expose to loss or injury or to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.). It is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Boyd*, 727 S.W.2d at 533; *In re J.J.*, 911 S.W.2d at 440. Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied); *In re D.M.*, 58 S.W.3d at 811. Termination under subsection (E) must be based on more than a single act or omission. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d at 634. A voluntary, deliberate, and conscious "course of conduct" by the parent that endangers the child's physical and emotional well being is required. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d at 634. Further, in considering whether a relevant "course of conduct" has been established, a court properly may consider both actions and inactions occurring both before and after a child's birth. *In re S.M.*, 389 S.W.3d 483, 491-92 (Tex. App.—El Paso 2012, no pet.).

Imprisonment alone does not constitute an endangering course of conduct, but it is a fact properly considered on the endangerment issue. *In re S.M.*, 389 S.W.3d at 492 (citing *Boyd*, 727 S.W.2d at 533-34). Conduct that routinely subjects children to the probability that they will be left

alone because the parent is once again jailed, whether because of the continued violation of community supervision or because of a new offense growing out of a continued use of illegal drugs, endangers both the physical and emotional well being of the children. *See In re S.D.*, 980 S.W.2d at 763.

### *The Evidence*

As noted above, the Department's caseworker, Goodson, was the Department's only witness. She testified that she gave D.N. a copy of the family plan of service that was filed with the court. However, she said, D.N. refused to sign a copy of the plan "because her attorney told her" not to do so without the attorney "looking at it." Goodson testified that D.N. did not start or complete any of her services, was uncooperative with the Department, and did not make any effort to get her children back. She also did not believe that if D.N.'s parental rights were not terminated, she would suddenly become cooperative, work her service plan, or maintain an active role in getting her children back.

Goodson stated that D.N. was incarcerated for a substantial part of the pendency of the case. She had contact with D.N. for a "brief time" during the pendency of this case. D.N. contacted her at the end of July 2013 to let her know that she was out of jail. She wanted to know what she needed to do to see her children and set up visitation. Goodson stated that D.N. was granted supervised visitation for one hour a week. She stated further that D.N. attended visitation once in late July 2013, and twice in August 2013. D.N. cancelled her visitations twice in August 2013, and afterwards, she ceased to return Goodson's calls regarding her visitations. Goodson testified that since late August 2013, she had not been able to contact D.N. She did not believe D.N. made reasonable efforts to get in contact with her children.

Goodson also testified briefly regarding C.N.'s family plan of service, stating that he did not complete parenting classes, counseling, or drug and alcohol testing. Even though C.N. was employed, he did not have stable housing. She said that C.N. had not stayed in touch with her or made arrangements to set up visitation with the children. But none of this testimony related to the Department's endangerment allegations against D.N. Goodson also testified that she believed termination of D.N.'s parental rights was in the children's best interest.

C.N. testified about his own circumstances, but did not describe any conduct by D.N. that endangered the children.

D.N. related that she had been a crime victim because she was nearly beaten to death shortly before she met C.N. Thereafter, she said, "MHMR" diagnosed her with a mental condition, but C.N. refused to help her continue services. At the time of trial, D.N. stated that she was under the care of a physician who had diagnosed her with depression and posttraumatic stress disorder. She testified that her current physician prescribed medication for both diagnoses, and that she was receiving therapy. D.N. said that she was willing to submit to drug testing, but requested that her physician be consulted.

According to D.N., she had been a housewife for eleven years prior to trial, had not heard from C.N. in nine months, and had not received any financial support from him. She testified that she was unable to get employment or transportation quickly because she had not worked or received help for her mental health problems. D.N. said that she loved her children. She stated that she had suffered because she was without her husband and did not have any support.

D.N. testified that she felt she had been "abandoned" by the Department and needed more time to complete her service plan. She also stated that, at one point, Goodson informed her that she could not visit her children because the caseworker was ill with either lupus or cancer. D.N. did not contact the caseworker again.

*Conclusion*

The record does not show that the Department presented any evidence regarding its allegations that D.N. demonstrated a voluntary, deliberate, and conscious "course of conduct" that endangered the children's physical and emotional well being. *See **In re D.M.**,* 58 S.W.3d at 812; ***In re D.T.**,* 34 S.W.3d at 634. Most, if not all, of the testimony pertained to D.N.'s mental health diagnoses, failure to attend visitations, and noncompliance with her service plan. The Department did not present any evidence to show how D.N.'s mental health or failure to attend visitations affected her conduct towards the children or her ability to parent. Even though there was testimony that D.N. had been incarcerated for some months during the pendency of this case, the Department presented no evidence that the children were regularly left alone because D.N. was jailed. *See **In re S.D.**,* 980 S.W.2d at 763. Although the trial court noted in the order of termination that D.N. failed to work her family plan of service, it also acknowledged that her failure could not be used as a ground for termination because the statutory nine months had not

9

passed since the date of removal.[2] Moreover, there is no evidence that D.N.'s failure to complete the family plan of service demonstrated a voluntary, deliberate, and conscious "course of conduct" that endangered the children's physical and emotional well being. *See **In re D.M.***, 58 S.W.3d at 812; ***In re D.T.***, 34 S.W.3d at 634.

Again, the Department argues that the trial court took judicial notice of the file and its contents. The Department contends that this evidence demonstrates D.N. had an extensive history with the Department, that she regularly left her children unattended, that the children often lacked enough food, and that the youngest child's condition was unhealthy. The Department argues that the malnourishment of D.N.'s youngest child and D.N.'s choice to leave the children alone unsupervised was a deliberate, conscious, and voluntary lack of parenting. In support of these statements, the Department cites to the trial court's file and the Department's initial affidavit attached to its original petition. As noted above, the trial court could properly take judicial notice that the Department filed an affidavit along with its original petition, but could not take judicial notice of the truth of the factual allegations in the affidavit. *See **In re J.E.H.***, 384 S.W.3d at 870.

Based on the record before us, no reasonable fact finder could have formed a firm belief or conviction that the Department's allegation was true—that D.N. engaged in conduct, or knowingly placed the children with persons who engaged in conduct, that endangered their physical or emotional well being. Therefore, we conclude that the evidence is legally insufficient to support a finding of termination of D.N.'s parental rights under Section 161.001(1)(E) of the Texas Family Code. Accordingly, D.N.'s third issue pertaining to legal sufficiency is sustained. Because we have held that the evidence is legally insufficient to support termination under Section 161.001(1)(E), we need not address D.N.'s fourth issue pertaining to factual sufficiency. *See* TEX. R. APP. P. 47.1.

## INDIAN CHILD WELFARE ACT

In our review of the record, we observed that in a status report from the Department to the trial court dated April 26, 2013, the "box" indicating the children's Native American status was checked. The status report explained that all three children's "possible Chocktaw Nation descent

---

[2] The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child. *See* TEX. FAM. CODE ANN. § 161.001(1)(O) (West 2014).

[was] reported by [C.N.], father, and is yet to be determined." The permanency plan and progress report to the trial court dated September 10, 2013, also indicated D.N.2's possible Native American status. This report repeated the language quoted above, but made no reference to the younger two children's current Native American status. The record does not show that the children's Native American status was determined prior to trial, and the order of termination makes no reference to the issue.

Congress passed the Indian Child Welfare Act in response to the "rising concern in the mid–1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32, 109 S. Ct. 1597, 1599-1600, 104 L.Ed.2d 29 (1989); *see also In re W.D.H.*, 43 S.W.3d 30, 34 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). The ICWA applies to all state child custody proceedings involving an Indian child when the court knows or has reason to know an Indian child is involved. 25 U.S.C.A. § 1912(a) (West, Lexis current through PL 113-103, approved May 16, 2014); *In re R.R., Jr.*, 294 S.W.3d 213, 217 (Tex. App.—Fort Worth 2009, no pet.). "Child custody proceeding" means, and includes, foster care placement, termination of parental rights, preadoptive placement, and adoptive placement. 25 U.S.C.A. § 1903(1) (West, Lexis current through PL 113-103, approved May 16, 2014). An Indian child is defined by the ICWA as an "unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C.A. § 1903(4) (West, Lexis current through PL 113-103, approved May 16, 2014). The ICWA, however, does not define what constitutes being a "member" or "being eligible for membership." *See* 25 U.S.C.A. § 1903(4). Each tribe has its own criteria for determining tribe membership. *See In re R.R.*, 294 S.W.3d at 217-18.

The Bureau of Indian Affairs created guidelines for state courts to use in Indian child custody proceedings to assist with the interpretation of the ICWA. *See* BUREAU OF INDIAN AFFAIRS GUIDELINES FOR STATE COURTS; INDIAN CHILD CUSTODY PROCEEDINGS, 44 FED. REG. 67,584 (Nov. 26, 1979). The Guidelines state that "[p]roceedings in state courts involving the custody of Indian children shall follow strict procedures and meet stringent requirements to justify any result in an individual case contrary to these preferences." BIA GUIDELINES FOR STATE

COURTS; INDIAN CHILD CUSTODY PROCEEDINGS, 44 FED. REG. at 67,586. Specific instructions are provided in the Guidelines for the determination of the status of an alleged Indian child. *See In re J.J.C.*, 302 S.W.3d 896, 900 (Tex. App.—Waco 2009, no pet.). The burden is placed on the trial court to seek verification of the child's status through either the Bureau of Indian Affairs or the child's tribe. BIA GUIDELINES FOR STATE COURTS; INDIAN CHILD CUSTODY PROCEEDINGS, 44 FED. REG. at 67,586 (stating that "the court shall seek verification of the child's status"). Further, the Guidelines provide that "[c]ircumstances under which a state court has reason to believe a child involved in a child custody proceeding is an Indian include [when] . . . (i) Any party to the case . . . informs the court that the child is an Indian child . . . . (ii) Any public or state-licensed agency involved in child protection services or family support has discovered information which suggests that the child is an Indian child." *Id.*

Under the ICWA, an Indian tribe is entitled to notice of a custody proceeding involving an Indian child. *See* 25 U.S.C.A. § 1912(a). It is the duty of the trial court and the Department to send notice in any involuntary proceeding "where the court knows or has reason to know that an Indian child is involved." 25 C.F.R. § 23.11 (Lexis current through May 22, 2014 issue). Section 23.11 also requires that the notice be sent to the "appropriate Regional Director" and the Secretary of the Interior. *Id.* § 23.11(a), (b), (f). Upon receiving the notice, the Secretary of the Interior or his designee is obliged to make reasonable documented efforts to locate and notify the tribe and the child's Indian parent or custodians within fifteen days or to notify the trial court how much time is needed to complete the search for the child's tribe. *Id.* § 23.11(f).

As noted above, a status report from the Department to the trial court dated April 26, 2013, indicated that the children's father, C.N., reported that the children were of "possible Chocktaw Nation descent." This was information discovered by a state licensed agency involved in child protection services that suggested D.N.2, R.N., and C.N.2 may be Indian children, and it was sufficient to trigger the ICWA's requirements for notification and determination of Indian status. *See In re J.J.C.*, 302 S.W.3d at 901 (holding that the trial court had reason to believe that the children were Indian because DFPS discovered that their maternal grandmother was alleged to be a member of the Chippewa Indian Nation); *In re R.R.*, 294 S.W.3d at 222 (holding that the trial court had reason to believe the children were Indian when mother testified that her grandmother was a registered member of the Kiowa Indian Nation). Therefore, the trial court was obligated to notify the Indian tribe for an inquiry into the children's Indian status. *See In re R.R.*, 294 S.W.3d

at 219 (noting that the Guidelines' listed circumstances "shall trigger an inquiry by the court and petitioners"). The notice provisions of the ICWA are mandatory. *See* BIA GUIDELINES FOR STATE COURTS; INDIAN CHILD CUSTODY PROCEEDINGS, 44 FED. REG. at 67,586 (providing that when a state court has reason to believe a child involved in a child custody proceeding is an Indian, the court shall seek verification of the child's status from either the BIA or the child's tribe).

## DISPOSITION

We have sustained the portion of D.N.'s first and third issues pertaining to the legal sufficiency of the evidence to support termination of her parental rights. Accordingly, we ***reverse*** the judgment of the trial court and ***render*** judgment that the Department's request for termination of the parent-child relationship between D.N. and D.N.2, R.N., and C.N.2 is ***denied***.[3] Because the Department remains the permanent managing conservator of the children, the trial court is instructed to give proper notification pursuant to the ICWA and determine the children's Indian status as defined by the ICWA.

**SAM GRIFFITH**
Justice

Opinion delivered July 9, 2014.
*Panel consisted of Worthen, C.J., Griffith, J. and Hoyle, J.*

(PUBLISH)

---

[3] Because the evidence is legally insufficient to support termination of D.N.'s parental rights pursuant to subsections (D) and (E), we do not address her challenge to the factual sufficiency of the evidence in regard to subsections (D) and (E). *See* TEX. R. APP. P. 47.1. D.N. does not dispute the trial court's finding that termination was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(2). Further, we do not alter the portion of the judgment regarding conservatorship of the children. Reversal of a trial court's termination judgment does not affect the trial court's conservatorship appointment absent assigned error. ***In re J.A.J.***, 243 S.W.3d 611, 613 (Tex. 2007) (reversal of termination judgment does not affect unchallenged conservatorship determination).



# COURT OF APPEALS

## TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# CORRECTED JUDGMENT

### JULY 9, 2014

### NO. 12-13-00373-CV

### IN THE INTEREST OF D.N., R.N., AND C.N., CHILDREN

Appeal from the 115th Judicial District Court
of Upshur County, Texas. (Tr.Ct.No. 238-13)

THIS CAUSE came to be heard on the appellate record and the briefs filed herein, and the same being considered, because it is the opinion of this court that there was error in the judgment of the court below, it is ORDERED, ADJUDGED and DECREED by this court that the judgment of the trial court be **reversed** and **render** judgment that the Department's request for termination of the parent-child relationship between D.N. and D.N.2, R.N., and C.N.2 is **denied**. Because the Department remains the permanent managing conservator of the children, the trial court is instructed to give proper notification pursuant to the ICWA and determine the children's Indian status as defined by the ICWA; and that this decision be certified to the court below for observance.

Sam Griffith, Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

14

# THE STATE OF TEXAS
# M A N D A T E
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**TO THE 115TH DISTRICT COURT of UPSHUR COUNTY, GREETING:**

Before our Court of Appeals for the 12th Court of Appeals District of Texas, on the 9th day of July, 2014, the cause upon appeal to revise or reverse your judgment between

**IN THE INTEREST OF D.N., R.N., AND C.N., CHILDREN**

**NO. 12-13-00373-CV; Trial Court No. 238-13**

Opinion by Sam Griffith, Justice.

was determined; and therein our said Court made its order in these words:

"THIS CAUSE came to be heard on the appellate record and the briefs filed herein, and the same being considered, because it is the opinion of this court that there was error in the judgment of the court below, it is ORDERED, ADJUDGED and DECREED by this court that the judgment of the trial court be **reversed** and **render** judgment that the Department's request for termination of the parent-child relationship between D.N. and D.N.2, R.N., and C.N.2 is **denied**. Because the Department remains the permanent managing conservator of the children, the trial court is instructed to give proper notification pursuant to the ICWA and determine the children's Indian status as defined by the ICWA; and that this decision be certified to the court below for observance."

**WHEREAS, WE COMMAND YOU** to observe the order of our said Court of Appeals for the Twelfth Court of Appeals District of Texas in this behalf, and in all things have it duly recognized, obeyed, and executed.

**WITNESS, THE HONORABLE JAMES T. WORTHEN**, Chief Justice of our Court of Appeals for the Twelfth Court of Appeals District, with the Seal thereof affixed, at the City of Tyler, this the _____ day of _____, 201____.

CATHY S. LUSK, CLERK

By:_____
    Deputy Clerk

15